UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                        :
UNITED STATES OF AMERICA and            :
The STATE OF MARYLAND,                   :
                                        :
          *Plaintiffs*,                  :
                                        :
          v.                            :          Civil Action No. 1:02-CV-01524-JFM
                                        :
MAYOR AND CITY COUNCIL OF               :
BALTIMORE, MARYLAND                     :
                                        :
          *Defendant*.                   :
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**PLAINTIFFS' MEMORANDUM IN RESPONSE TO THE MOTION OF BLUE WATER BALTIMORE FOR LEAVE TO INTERVENE**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .......................................................................1

BACKGROUND .........................................................................................1

ARGUMENT ...........................................................................................6

**A.** Proposed Intervenor is Not Entitled To Intervene. .......................................6

    **1.** The Motion is Untimely. .........................................................................6

    **2.** Intervention is Unnecessary. ....................................................................8

    **3.** Intervenor Lacks Standing. ................................................................11

    **4.** There is No Jurisdiction over Proposed Intervenor's Motion..............................13

**B.** If the Court grants the Motion for Intervention, the Scope of the Intervention should
be Limited. ...............................................................................................14

CONCLUSION.........................................................................................15

Declaration of Allison Graham ........................................................Appendix A

# CASES

Dillard v. Chilton County Comm'n, 495 F.3d 1324, 1337-38 (11th Cir. 2007) ......................11,12

DuBois v. Thomas, 820 F. 2d 943, 949 (8th Cir. 1987) .................................................................15

Gould v. Alleco, Inc. 883 F.2d 281, 286 (4th Cir. 1989).................................................................7

Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc., 484 U.S. 49, 60 (1987)..............15

Hartley Pen Co. v. Lindy Pen Co., 16 F.R.D. 141, 153 (S.D. Cal. 1954)......................................14

Local No. 93, Int'l Ass'n of Firefighters v. Cleveland, 478 U.S. 501, 529 (1986).........................15

Mausolf v. Babbitt, 85 F.3d 1295, 1303(8th Cir. 1996) .................................................................8

New York News, Inc. v. Kheel, 972 F.2d 482, 486 (2d Cir. 1992)................................................11

South Dakota ex rel Barnett v. U.S. Dept of Interior, 317 F.3d 783,785 (8th Cir. 2003)................8

United States v. City of New York, 198 F.3d 360, 365 (2d Cir. 1999) ....................................8,11

United States v. DeKalb Cnty., Ga., No. 1:10-cv-4039-WSD, 2011 WL 6369569, at *9 (N.D. Ga. Oct. 11, 2011)...........................................................................................................................11,12

United States v. District of Columbia, 933 F. Supp. 42, 47 (D.D.C. 1996) ..................................15

United States v. Duke Energy Corp., 218 F.R.D. 468, 469-71 (M.D.N.C. 2003) .........................11

United States v. Ketchikan Pulp Co., 430 F. Supp. 83, 85 (D. Alaska 1977)................................15

United States v. Metropolitan Dist. Comm'n, 679 F. Supp. 1154, 1155-64 (D. Mass. 1988) .......11

Vinson v. Washington Gas Light Co., 321 U.S. 489, 498 (1944) .......................................11,12,14

Warth v. Seldin, 422 U.S. 490, 498 (1975)...................................................................................11

Washington Elec. Co-op., Inc. v. Massachusetts Mun. Wholesale Elec. Co., 922 F.2d 92, 97 (2d Cir. 1990) .................................................................................................................................11,12

# STATUTES

33 U.S.C. § 1365(b)(1)(B) ..............................................................................................................6

## REGULATIONS

Fed. R. Civ. P. 24(a)(1)..................................................................................................6

Fed. R. Civ. P. 24(a)(2)..................................................................................................8

Fed. R. Civ. P. 24(b)(1)..................................................................................................7

Fed. R. Civ. P. 24........................................................................................................11

## OTHER AUTHORITIES

67 Fed. Reg. 34953-01 (May 16, 2002)..........................................................................1

## PRELIMINARY STATEMENT

The United States of America and the State of Maryland ("Plaintiffs") file this response in opposition to the Motion of Blue Water Baltimore for Leave to Intervene ("the Proposed Intervenor").  The Plaintiffs oppose the intervention by the Proposed Intervenor because it is untimely, the Proposed Intervenor is adequately represented by the Plaintiffs, the Proposed Intervenor lacks standing, and the Court does not have jurisdiction to address concerns outside the scope of Plaintiffs' resolved action through intervention.  Should the Court determine that intervention by the Proposed Intervenor is warranted, the Plaintiffs request that the Court impose reasonable limitations as discussed herein.

## BACKGROUND

On April 26, 2002, the Plaintiffs filed a complaint against the City of Baltimore alleging that the City violated the Clean Water Act for discharging untreated sewage from its sanitary sewer collection system.  Docket No. 1.  Simultaneous with filing the complaint, the Plaintiffs' lodged a proposed Consent Decree which required that Baltimore pay a $600,000 penalty and implement injunctive relief to resolve the claims alleged in the complaint. Docket No. 2.  Notice of the proposed Consent Decree was published in the Federal Register providing for a public comment period.  67 Fed. Reg. 34953-01 (May 16, 2002).  The Plaintiffs received two comments on the proposed Consent Decree, one from a community organization and another from a private citizen.[1] Docket No. 3, Appendix B.  The Plaintiffs responded to the comments in the motion to

---

[1] Although Proposed Intervenor did not comment on the 2002 Consent Decree, the Herring Run Watershed Association ("HRWA"), a group that is now part of Blue Water Baltimore, did submit one of the comments.  The HRWA comment questioned whether landscape and stream buffer restoration efforts would take place following sewer construction projects.  Plaintiffs responded

1

enter the proposed Consent Decree.   Docket No. 3. The proposed Consent Decree was entered as final by this Court on September 30, 2002 ("Consent Decree") and this matter was closed. Docket No. 4.

Since then, Baltimore has been implementing the Consent Decree.  The Consent Decree requires Baltimore to update its sanitary sewer system infrastructure through planned construction projects to eliminate combined sewer overflows and to significantly reduce sanitary sewer overflows by 2016.  Consent Decree, ¶¶8-15.  These projects include elimination of sanitary sewer overflow structures and combined sewer overflow discharges, elimination of any physical connections between sanitary and storm water sewers, and rehabilitation of pumping stations, valves and other infrastructure.  Consent Decree, ¶¶8, 10, and 11.  *Id.* Baltimore must also operate and maintain the system and generate and implement an emergency response plan for discharges and report discharges.  Consent Decree, ¶16.  Finally, Baltimore is required to evaluate its collection system, submit and implement plans for future rehabilitation and other corrective actions for specific sewersheds. Consent Decree, ¶9.  Baltimore must submit these sewershed rehabilitation plans to Plaintiffs for review and approval.  *Id.*   These plans illustrate in detail the work Baltimore will undertake to reach its compliance goals in each sewershed according to a specified schedule, with work scheduled to be completed no later than January 1, 2016. *Id.* and Declaration of Allison Graham ("Graham Decl.") ¶¶7, 8, 10, and 11.

---

to these concerns in the Plaintiffs' motion to enter the consent decree.  See Docket No. 3 at 20-24.  The other commenter, a private citizen, raised a concern that the 2002 Consent Decree did not address leaks from the sanitary sewer system, specifically manholes, into storm water sewers. Similar to Proposed Intervenor, this commenter appears concerned about storm water discharges containing sewage.  The Plaintiffs responded in the motion to enter the consent decree.  See Docket No. 3 at page 27-33.

At the outset, Plaintiffs recognized that Baltimore would continue to have sanitary sewer overflows while implementing the Consent Decree to achieve compliance, given the schedule's duration through 2016. Graham Decl. ¶7. Thus, the Consent Decree requires Baltimore to pay stipulated penalties for failure to meet specific milestones identified in the Consent Decree and for certain overflows from its sanitary sewer collection system.  Consent Decree, ¶23. Specifically, the Consent Decree addresses overflows from "the collection and transmission system . . ." designed to transmit sewage to Baltimore's treatment plants.  Consent Decree ¶7M and B. (definition of "Overflow" and "Collection system").

The stipulated penalties that can be assessed for  overflows from the sewage collection system excludes capacity-related, wet-weather discharges from certain overflow structures during the period prior to the date set in the Consent Decree for the elimination of such structures.  Consent Decree ¶23M.  Discharges of sewage through storm sewers are not covered by the Consent Decree, unless those discharges originate from Baltimore's sewage collection system.  For example, sewage overflows that are discharged through a storm sewer (as opposed to a sanitary sewer) are subject to penalties if it reaches the storm sewer by infiltration or cross-connection through the sewage collection system.  Consent Decree ¶¶17A., 23M.  Discharges of sewage through storm sewers which originate from connections to private sewer lines are not covered by the Consent Decree. *Id.*  Additionally, the Consent Decree gives the Plaintiffs unreviewable discretion to waive any stipulated penalty. Consent Decree ¶28.

Thus, the Parties contemplated and negotiated which Consent Decree compliance requirements and which sanitary sewer discharges occurring during the implementation of the Consent Decree would be subject to stipulated penalties.  The Parties recognized that sanitary

3

sewer overflows would occur in the interim, and the parties agreed to a final compliance deadline in the Consent Decree after careful deliberation.  Consent Decree, ¶¶9 and 23M.

To date, Baltimore has completed a number of the requirements specified in the Consent Decree. Graham Decl. ¶8. The work already completed has amounted to approximately $710 million, according to figures provided by Baltimore. *Id.*  The City completed most of the 26 projects listed in Appendix D of the Consent Decree, resulting in: the elimination of 60 out of 62 known sanitary sewer overflow structures; increasing the capacity of the Jones Falls Pumping Station from 35 million gallons per day ("MGD") to 55 MGD; design and construction of a 20 MGD wet weather pumping station in Stony Run; approximately 15 miles of additional or replaced relief sewers; about 29 miles of sewer rehabilitation; and the separation of the remaining combined sewer systems in the city. *Id.* Baltimore also completed a thorough inspection and assessment of its eight sewersheds that include among others infiltration and inflow (I/I) evaluation and identifying structural improvement projects. *Id.*

Among its remaining obligations required by the Consent Decree, Baltimore must construct new, and improve existing, infrastructure in specific sewersheds. Consent Decree, ¶9. Baltimore is required to submit and implement eight sewershed plans, one for each sub-sewershed of Baltimore's sewage collection system. *Id.*  The sewershed plans must evaluate the benefits of any completed construction projects, any existing deficiencies and the expected benefits of future projects; propose rehabilitation and corrective measures; provide a specific schedule for rehabilitation and corrective measures, and conduct the work accordingly. *Id.*  These plans must also present results of inspections, present infiltration and inflow ("I/I") information

and long term capacity and peak flow evaluations.  *Id.*  The work that will be done through the sewershed plans represents the bulk of the Consent Decree's remedial work.  Graham Decl. ¶7.

Baltimore submitted eight sewershed plans. Graham Decl. ¶10.  On February 10, 2011, EPA disapproved those plans because EPA concluded that the proposed plans did not go far enough in reducing sanitary sewer overflows. *Id.*  Since then, Baltimore has submitted sewershed plan revisions to Plaintiffs.  *Id.*  Plaintiffs have reviewed and commented on the plan revisions and expect to decide whether to approve the plans as modified shortly. *Id.*

Plaintiffs are actively monitoring Baltimore's compliance. Graham Decl. ¶¶5 and 6. Plaintiffs have enforced the provisions of the Consent Decree against Baltimore by reviewing Baltimore's submissions, demanding revisions in the sewershed plans and by assessing stipulated penalties for overflows.  Graham Decl. ¶¶6, 9, 10, 13, 15 and 16.  Plaintiffs assessed approximately $600,000 in stipulated penalties just for overflows that occurred from 2006-2010, and are working on assessing more penalties for more recent overflows. Graham Decl. ¶15. These penalties have been issued for sanitary sewer discharges; Baltimore has met other obligations (where stipulated penalties could have been issued) under the Consent Decree.  *Id.* Most recently, Plaintiffs are reviewing and discussing with Baltimore the revised sewershed plans, reviewing annual updates to the emergency responses and operation and maintenance plans, and assessing penalties for more recent sanitary sewer overflows. Graham Decl. ¶¶10 and 15.  In addition, Plaintiffs have met with Proposed Intervenor and have responded to its requests for information regarding Plaintiffs' enforcement of the Consent Decree. Graham Decl. ¶19.

## **ARGUMENT**

Proposed Intervenor's Motion is untimely and unnecessary given that the case is closed, Baltimore's work plan for long-term compliance with the Clean Water Act required under the Consent Decree-which was subject to public notice and comment- is still ongoing, and Plaintiffs are actively monitoring Baltimore's compliance efforts. Proposed Intervenor lacks standing to intervene in this closed matter and the Court lacks jurisdiction to address Proposed Intervenor's concerns which are outside the scope of Plaintiffs' original complaint and the Consent Decree. Finally, while the Plaintiffs would not object, with appropriate limitations, to Proposed Intervenor's intervention if this matter is reopened in the future, the instant motion is untimely as the parties have not yet sought to reopen the Consent Decree. Accordingly, the Plaintiffs' request that the Proposed Intervenor's Motion be denied.

### **A. Proposed Intervenor is Not Entitled To Intervene.**

#### **1. The Motion is Untimely.**

The Proposed Intervenor is not entitled to intervene at this late date either as a matter of right or through permissive intervention because the Motion is untimely. CWA Section 505(b)(1)(B), 33 U.S.C. § 1365(b)(1)(B), and Fed. R. Civ. P. 24(a)(1) gives Proposed Intervenor an unconditional right to intervene only in certain circumstances. Among these, Proposed Intervenor's Motion to intervene must be timely. Likewise, for permissive intervention pursuant to Fed. R. Civ. P. 24(b)(1), the Motion also must be timely. Because Proposed Intervenor's Motion is untimely, Proposed Intervenor is not entitled to intervene, either as a matter of right or pursuant to permissive intervention.

The case was commenced on April 26, 2002, and was resolved upon entry of the Consent Decree on September 30, 2002.  Proposed Intervenor's request to intervene, eleven years after the Consent Decree was entered, is untimely.  The Consent Decree was published for notice and comment by the public, and the Consent Decree was entered as final. Docket No. 4.  The Proposed Intervenor had the opportunity to offer its comment on the substantive provisions of the Consent Decree during the public comment period.  The public comment period has long since been closed.

In addition, contrary to Proposed Intervenor's position, the three factors considered in the Fourth Circuit to determine whether intervention is timely . . . "militates against the motion." *Gould v. Alleco*, Inc. 883 F.2d 281, 286 (4th Cir. 1989). These factors are "how far the suit has progressed, the prejudice which delay might cause other parties, and the reason for the tardiness in moving to intervene . . ." *Id.*  As with first factor, the original dispute has "progressed" to conclusion with the entered Consent Decree.   Thus, the claims in Plaintiffs' original complaint are no longer pending; there is no active ongoing litigation.  The second factor also does not apply because the matter is resolved.  Finally, as to the third factor, the Plaintiffs have been actively monitoring Baltimore's progress under the Consent Decree and have taken enforcement measures when warranted.    Graham Decl. ¶¶ 15, 16 and 17.  Baltimore still has significant work obligations to be undertaken, consistent with the terms of the Consent Decree, which require implementation of the sewershed plans by 2016.  Graham Decl. ¶¶7, 8, 9 and 10.   As a resolved matter, with a continuing compliance schedule, active enforcement by Plaintiffs, and a final compliance deadline that was negotiated and published for review and comment over 11 years ago,  it is improper for a non-party to intervene in a closed matter when there are no new issues before the court.   In this respect, the Proposed Intervenor's Motion is filed too late in this matter.

7

Proposed Intervenor notes that Plaintiffs are considering a request by Baltimore to modify the Consent Decree; however this is not before the Court at this time. Courts regularly reject attempts by non-parties who intervene during a settlement phase. *Gould,* 883 F.2d at 285. This matter has not been reopened, there is no active dispute pending judicial review between the Parties and Plaintiffs have not lodged a proposed modification to the Consent Decree with the Court.   Here, given that the original complaint was resolved through a final entered settlement and there are no issues before the court, the Proposed Intervenor's Motion is too early to allow for participation at present.

## 2.  Intervention is Unnecessary.

Under Fed. R. Civ. P. 24(a)(2), if Proposed Intervenor does not have a statutory right to intervene, then it may intervene by right if it "claims an interest relating to . . . the subject of the action . . . unless existing parties adequately represent that interest." The United States' goal in enforcement actions of this nature is to protect the interests of its citizens, including the Proposed Intervenor, and the environment. *See Mausolf v. Babbit*, 85 F.3d 1295, 1303 (8th Cir. 1996) (*quoted in South Dakota el rel Barnett v. U.S. Dep't of Interior*, 317 F.3d 783, 785 (8th Cir. 2003) ("the government is presumed to represent the interests of all its citizens"); *see also U.S. v. City of New York*, 198 F.3d 360, 367 (2d. Cir. 1999).  Here, Plaintiffs have the same interest as Proposed Intervenor in ensuring that Baltimore complies with the Consent Decree and with the Clean Water Act. Thus, Proposed Intervenor's rights are and continue to be adequately represented by the United States, and Proposed Intervenor failed to establish to the contrary. *See* Fed. R. Civ. P. 24(a)(2).

8

Many of the components of the Consent Decree have been concluded, which demonstrates that the Plaintiffs are requiring compliance with the Consent Decree. Graham Decl. ¶8.  Plaintiffs have also actively monitored Baltimore's work under the Consent Decree and have sought and collected stipulated penalties when warranted. Graham Decl. ¶¶6, 9, 10, 13, 15, and 16.    Throughout Baltimore's implementation of the work in the Consent Decree, Plaintiffs have also required additional reporting, corrective measures and more robust compliance goals. Graham Decl. ¶¶13 and 14.  This case is a resolved matter with an ongoing compliance schedule actively enforced by the Plaintiffs.  It is improper to allow Proposed Intervenor the ability to intervene and impose additional terms.

Proposed Intervenor does not identify which provisions of the Consent Decree are violated by the sewage overflows it references in its Complaint and Intervention and Exhibits, but rather describes all "acts and omissions" as violations.   Proposed Intervenor's Complaint in Intervention, ¶37.  As discussed above, the Consent Decree contemplated that some overflows would continue to occur through implementation, thus overflows are allowable and either not considered violations or are subject to stipulated penalties. Consent Decree, ¶23M.

Several of the specific sewage overflows identified in the Complaint in Intervention concern sewage discharges through storm water sewers. See Proposed Complaint in Intervention ¶34, b., d. and f.  Baltimore has told EPA that it is investigating the source of those discharges. Graham Decl. ¶13.  Those discharges will be subject to requirements of the 2002 Consent Decree if it is determined that they originated from Baltimore's sewage collection system. Graham Decl. ¶13.  Proposed Intervenor is also concerned about overflow structure 67, which Baltimore is required to eliminate pursuant to Paragraph 8 of the Consent Decree. Proposed Complaint in

9

Intervention ¶34, a.   Baltimore requested an extension for completing this project because it is tied to a major hydraulic restriction at the Back River Wastewater Treatment Plant that affects about ten miles of sewer lines that Baltimore is working to correct. Graham Decl. ¶¶9 and 11. Plaintiffs are considering this extension.   Graham Decl. ¶9.   Proposed Intervenor also referred to Baltimore's alleged failure to issue public notification, calculate volume of overflows or otherwise fully implement the emergency response plan following Hurricane Sandy.   Proposed Complaint in Intervention ¶34, b. and e.   Although the obligations of the Consent Decree continue to apply through inclement weather, assessing Baltimore's compliance with the Consent Decree by the actions it took in response to overflows that occurred during Hurricane Sandy may result in an unfair assessment, considering the challenges that all mid-Atlantic municipalities were facing at that time. Graham Decl. ¶17.   Thus, while EPA asked Baltimore to respond to the concerns raised by Proposed Intervenor, the overflows and incidents listed in the Proposed Complaint in Intervention are not evidence of significant noncompliance by the City and are not failures to enforce the requirements of the Consent Decree by the Plaintiffs. Graham Decl. ¶19.

That said, Plaintiffs have met with the Proposed Intervenor and are conscious of the group's concerns over the City's progress with the Consent Decree.   Graham Decl. ¶19.   If the Parties seek to modify the Consent Decree in the future Plaintiffs will look to involve interested parties in that process.   In addition to the Plaintiffs' knowledge and consideration of Proposed Intervenor's concerns and Plaintiffs' intention to involve interested parties if the occasion arises in the future, Proposed Intervenor will also have a formal opportunity to be heard through the notice and comment procedure if the Parties reopen this case to lodge a modification to the Consent Decree.   The Plaintiffs are required to publish any material modification for notice and comment. Consent Decree ¶ 69.

Proposed Intervenor fails to meet its burden to establish that its interests are not adequately represented by the Government.

### 3.  Intervenor Lacks Standing.

While Fed. R. Civ. P. 24 and CWA Section 505(b)(1)(B) permit a citizen to intervene in a civil action that the United States "has commenced and is diligently prosecuting," they do not give Proposed Intervenor the right to intervene in an action that has already concluded. *United States v. Metropolitan Dist. Comm'n*, 679 F. Supp. 1154, 1155-64 (D. Mass 1988); *see generally, e.g., United States v. Duke Energy Corp.*, 218 F.R.D. 468, 469-71 (M.D.N.C. 2003). Additionally, "[a]n intervenor may not enlarge the scope or nature of a proceeding. [Rather,] '[a]n intervenor is admitted to the proceeding as it stands, and in respect of the pending issues, but is not permitted to enlarge those issues or compel an alteration of the nature of the proceeding.'" *United States v. DeKalb Cnty., Ga.*, No. 1:10-cv-4039-WSD, 2011 WL 6369569, at *9 (N.D. Ga. Oct. 11, 2011) (*quoting Vinson v. Wash. Gas Light Co.*, 321 U.S. 489, 498 (1944)); *see generally United States v. City of New York*, 198 F.3d 360, 365 (2d Cir. 1999) (*quoting New York News, Inc. v. Kheel*, 972 F.2d 482, 486 (2d Cir. 1992) (*quoting Washington Elec. Co-op., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 922 F.2d 92, 97 (2d Cir. 1990))).

To establish that it has Article III standing to intervene in this action, Proposed Intervenor must allege an actual case or controversy. *See, e.g., Warth v. Seldin*, 422 U.S. 490, 498 (1975). To demonstrate an ongoing claim or controversy exists when a consent decree has been entered, a party to the consent decree must be seeking "judicial resolution of [the] dispute." *See Dillard v. Chilton County Comm'n*, 495 F.3d 1324, 1337-38 (11th Cir. 2007).   Proposed Intervenor must also have independent standing to intervene in this case at this late date. *Dillard,* 495 F.3d at

11

1337-40 (11th Cir. 2007)  (noting that "[t]he district court's perpetuation of its jurisdiction for purposes of enforcement of a consent decree is insufficient, by itself, to justify [a potential intervenor's] piggybacking" off the parties' standing).

Pursuant to the Consent Decree, the controversy between the parties was concluded. The Consent Decree is a binding obligation between the parties to it. Third parties, such as Proposed Intervenor, have no standing to enforce the terms of what is essentially a contract between other unrelated parties. At this time, Plaintiffs have no ongoing claims, and neither party to the Consent Decree is seeking judicial relief against the other.

This court also does not have authority to address, through intervention in this proceeding, Proposed Intervenor's concerns that are beyond the scope of the Plaintiffs' initial action and its resolution. The Court retained jurisdiction solely to ensure enforcement of the Consent Decree.  Because Proposed Intervenor cannot broaden the scope of this case, which has no pending unadjudicated controversies, Proposed Intervenor cannot establish that it has standing to intervene. *See id.*; *Dillard*, 495 F.3d at 1337-40; *DeKalb Cnty.*, 2011 WL 6369569, at *9; *Vinson*, 321 U.S. at 498; *Washington Elec. Co-op., Inc.*, 922 F.2d at 97 (2d Cir. 1990).

Proposed Intervenor discussed several sanitary sewer overflows that occurred through storm sewers; however these are not covered by the Consent Decree, unless it is determined that the discharges originated from the sanitary sewer system. Graham Decl. ¶13; Consent Decree ¶¶17A. and 23M.

Discharges through Baltimore's municipal separate storm sewer system ("MS4") are subject to a separate discharge permit under the Clean Water Act which requires Baltimore to establish a program to address illegal discharges into the storm water system.  Graham Decl. ¶20.

12

This is not a requirement under the Consent Decree.  Instead, this is a requirement of Baltimore's

MS4 permit. Graham Decl. ¶20; *see also* 40 C.F.R. §122.26.  Baltimore's current permit was

issued in 2005 and continues to apply through administrative extension. Graham Decl. ¶20.

Through an administrative process completely separate from implementation of the Consent

Decree, Baltimore has applied for, and the Maryland Department of the Environment ("MDE")

has proposed for comments, a new MS4 permit.  Graham Decl. ¶20.  The appropriate forum to

raise issues related to Baltimore's storm water program is through the permit process.  Proposed

Intervenor submitted comments on Baltimore's proposed storm water permit.  Proposed

Complaint in Intervention, Exhibit B, Attachment E.

Thus, given that there is no active litigation in this matter, Proposed Intervenor cannot

"piggyback" on the parties' original standing through the case or controversy alleged as claims in

Plaintiffs', now resolved, complaint.  Further, the storm-water related issues were not part of

Plaintiffs' original case or controversy, and thus Proposed Intervenor cannot expand the scope of

the Court's jurisdiction to consider these issues through intervention in this matter.[2]

### 4.  There is No Jurisdiction over Proposed Intervenor's Motion.

By the terms of the Consent Decree, this Court lacks jurisdiction over Proposed

Intervenor's Motion. This Court retained limited jurisdiction to enforce the terms and conditions

of the Consent Decree and adjudicate disputes related to it that may arise between the parties.

---

[2] Although not covered by the 2002 Consent Decree, Plaintiffs acknowledge that the sewage
discharges through storm water are a public health and water quality concern.  For this reason,
EPA urged Baltimore to promptly investigate and address the source of sewage discharges
through storm sewers, and address them as required by the 2002 Consent Decree if it is
determined that the sewage discharge did originate from the sewage collection system. Graham
Decl. ¶¶13 and 14.

Consent Decree, ¶40.  The underlying claims were resolved through the settlement. Neither the Plaintiffs nor Baltimore are seeking judicial resolution of any disputes. The Court did not retain jurisdiction over matters raised by third parties, like Proposed Intervenor.  Rather, jurisdiction was limited to resolving disputes between the parties that may arise at some future time related to the requirements of Consent Decree. Consent Decree ¶¶41-46. Even then, failure of the Parties to engage in informal dispute resolution serves as a jurisdictional bar.[3]

### B.  If the Court grants the Motion for Intervention, the Scope of the Intervention should be Limited.

Rule 24 does not allow a proposed intervenor unlimited access to ongoing proceedings; an intervenor must accept the proceedings as it finds them.  *Hartley Pen Co. v. Lindy Pen Co.,* 16 F.R.D. 141, 153 (S.D. Cal. 1954); *see also Vinson v. Washington Gas Light Co.*, 321 U.S. 489, 498 (1944) ("[A]n intervenor is admitted to the proceeding as it stands, and in respect of the pending issues, but is not permitted to enlarge those issues or compel an alteration of the nature of the proceeding.").

Currently there are no pending issues in the proceeding as it stands, however if the Parties lodge a proposed modification to the 2002 Consent Decree, that would be the only pending issue that Proposed Intervenor may participate in.  The Proposed Intervenor has a right to comment if the Parties lodge a proposed modification to the 2002 Consent Decree with the Court. Consent

---

[3] Section XIV of the 2002 Consent Decree prescribes that "[a]ny dispute that arises with respect to the . . . implementation . . . of th[at] Consent Decree, or with respect to Defendants' compliance [t]herewith or any delay [t]hereunder . . . shall in the first instance be the subject of informal negotiations between Baltimore, EPA and MDE." 2002 Consent Decree, ¶42 at 59-60. Only if the parties are unable to resolve the dispute informally may they petition the Court for resolution of the dispute. See 2002 Consent Decree, ¶43-46 at 60-61. There are presently no disputes between the Parties to the 2002 Consent Decree.

Decree ¶69.     If the Court grants the Proposed Intervenor's Motion for Intervention, now or at a

later time, the United States requests that the Court limit the scope of the intervention to: (1)

filing objections to any proposed modification to the Consent Decree; and (2) filing an appeal

should the proposed modification to the Consent Decree be entered.  Such limitations would

allow the Proposed Intervenor the opportunity to raise its concerns and still preserve the strong

policy in favor of settlements.

In the context of citizen suit actions, the Supreme Court has determined that a "citizen

suit is meant to *supplement* rather than to supplant governmental action." *Gwaltney of Smithfield,*

*Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 60 (1987) (emphasis added); *see also DuBois*

*v. Thomas*, 820 F.2d 948, 949 (8th Cir. 1987). Indeed, an intervenor "does not have power to

block [a] decree merely by withholding its consent." *Local No. 93, Int'l Ass'n of Firefighters v.*

*Cleveland*, 478 U.S. 501, 529 (1986) (citations omitted). Indeed, doing so "would wreak havoc

upon government enforcement actions." *United States v. Ketchikan Pulp Co.*, 430 F. Supp. 83,

85 (D. Alaska 1977); *United States v. District of Columbia*, 933 F. Supp. 42, 47 (D.D.C. 1996)

(same).  If allowed to intervene, Proposed Intervenor's status would change as it is elevated

merely from a public commenter to intervenor-plaintiff in this action, but the nature of their

secondary role in enforcement proceedings by the Government would remain the same. *See id.*

## <u>CONCLUSION</u>

In sum, Proposed Intervenor's Motion is untimely given that the case is closed,

Baltimore's work plan for long-term compliance with the Clean Water Act required under the

Consent Decree-which was subject to public notice and comment- is still ongoing, and Plaintiffs

are actively monitoring Baltimore's compliance efforts.  At this time, the Parties have not sought

to lodge a modification to the Consent Decree.   While the Plaintiffs would not object, with

appropriate limitations, to Proposed Intervenor's intervention if this matter is reopened in the

future, the instant motion is wholly inappropriate and untimely. Accordingly, the Plaintiffs'

request that the Proposed Intervenor's Motion be denied.


                              Respectfully submitted,


                              ROD J. ROSENSTEIN
                              United States Attorney


                              ROBERT G. DREHER
                              Acting Assistant Attorney General
                              Environment and Natural Resources Division


                               /s/ Cara M. Mroczek
                              CARA M. MROCZEK
                              U.S. Department of Justice
                              Environmental Enforcement Section
                              601 D. Street NW
                              Washington, DC 20004
                              202-514-1447 (PHONE)
                              cara.mroczek@usdoj.gov (EMAIL)

                              OF COUNSEL:

                              Nina Rivera
                              Assistant Regional Counsel
                              U.S. Environmental Protection Agency
                              1650 Arch Street (3RC42)
                              Philadelphia, PA 19103
                              *Attorneys for the United States of America*

Respectfully submitted,


DOUGLAS F. GANSLER
Attorney General of Maryland


/s/ Nancy W. Young
NANCY W. YOUNG
Federal Bar No. 08531
Office of the Attorney General
Maryland Department of the Environment
1800 Washington Blvd, Suite 6048
Baltimore, MD 21230
Phone:  (410) 537-3042
Fax:  (410) 537-3943
Email: nancy.young@maryland.gov


*Attorney for the State of Maryland*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 27, 2013, I filed the Plaintiffs' Memorandum in Response to the Motion of Blue Water Baltimore for Leave to Intervene using the Court's electronic case filing system, which will send electronic notice of such filing to all counsel of record registered on the case management/electronic filing ("CM/ECF") system including, but not limited to:

Cara Marie Mroczek      cara.mroczek@usdoj.gov

Emily A Vainieri      emily.vainieri@maryland.gov, elaine.hayden@maryland.gov, nancy.young@maryland.gov

Nancy W Young      nancy.young@maryland.gov

P Michael Cunningham      michael.cunningham@usdoj.gov, vanessa.davis@usdoj.gov

Patrick M Phelan      pphelan@cov.com, tbrugato@cov.com, tgarrett@cov.com

Peter E Keith      pkeith@gejlaw.com, dtaylor@gejlaw.com

Theodore L Garrett      tgarrett@cov.com

Thomas Mark Lingan      tmlingan@venable.com, dsguth@venable.com

Thomas R Brugato      tbrugato@cov.com

Thurman W Zollicoffer , Jr      tzollicoffer@wtplaw.com

s/ Cara M. Mroczek
Cara M. Mroczek

18

# APPENDIX A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
UNITED STATES OF AMERICA and              :
The State of Maryland,                    :
                                          :
            Plaintiffs,                    :
                                          :
        v.                                 :        Civil Action No. 1:02-CV-01524-JFM
                                          :
MAYOR AND CITY COUNCIL OF                 :
BALTIMORE, MARYLAND                       :
                                          :        DECLARATION OF ALLISON GRAHAM
            Defendant.                     :
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

ALLISON GRAHAM, pursuant to 28 U.S.C. §1746, declares the following under the penalty of perjury:

1.  I submit this declaration in support of the Response of the United States of America and the State of Maryland to the Motion to Intervene in this case. Except where noted otherwise, I have personal knowledge of the information set herein.

2.  I am employed by the United States Environmental Protection Agency, Region III ("EPA") as an Environmental Engineer in the NPDES Enforcement Branch of the Water Protection Division. I have been employed at EPA since July 2008. I received a Bachelor of Science degree in Civil Engineering with a minor in Environmental Engineering from the Pennsylvania State University in 2002 and a Master's of Science degree in Water Resources and Environmental Engineering from Villanova University in 2006. I received my Engineer in Training (E.I.T.) certification in 2003.

3.  Prior to my employment at EPA, I was employed by the Naval Surface Warfare Center, Carderock Division. I served as an Environmental Engineer in the Hazardous Material Control and Management section in the Service Engineering Branch of the Environmental Quality Division. I was the Oil and Hazardous Substance Spill Response Program Manager and the Lead on the Navy Hazardous Material Afloat Program Policy and Technical Document Working Group. I also worked for the Engineering Field Activity Northeast - Naval Facilities Engineering Command. I served as an Environmental Engineer in the Water Programs Branch providing technical and regulatory compliance assistance pertaining to wastewater and stormwater to Navy and Marine Corps facilities.

4.  As an Environmental Engineer at EPA Region III, I am responsible for conducting and

leading municipal wastewater inspections, municipal stormwater audits, and stormwater inspections at construction sites and at industrial and municipal facilities. I review discharge monitoring data and various technical documents and reports to determine compliance with the Clean Water Act, 33 U.S.C. § 1251 et seq., and develop documents relating to Clean Water Act enforcement. Additionally, I manage and track compliance with formal enforcement action requirements and review and comment on technical documents submitted by regulated entities as required by the associated action.

5.    I am responsible for tracking compliance by the City of Baltimore, Maryland ("City" or "Baltimore") with the Consent Decree in Civil Action No. 1:02-CV-01524-JFM ("Decree" or "CD").

6.    I have been tracking compliance with the Baltimore City CD since late 2008. Compliance oversight of the Baltimore City CD includes reviewing and responding to technical documents and reports submitted under the CD such as Collection System Evaluation and Sewershed Plans (sewershed plans) and technical memorandums, assessing stipulated penalties for sanitary sewer overflows throughout the City's collection system, coordination and communication with the Maryland Department of the Environment (MDE) to ensure mutual results are achieved, organizing and attending technical meetings with the City and MDE, responding to citizen complaints, responding to Freedom of Information Act (FOIA) requests, and meeting with public interest groups including Blue Water Baltimore.

7.    Baltimore maintains 1400 miles of sanitary mains, operates two wastewater treatment plants (WWTPs), collects and treats an average flow of 210 million gallons of wastewater daily, and operates 8 major pumping stations. The CD acknowledges that Baltimore has violated and continues to violate Section 301 of the Clean Water Act by discharging untreated sewage from its sewage collection system to the Back River, Patapsco River, Chesapeake Bay, and several smaller water bodies and recognizes that investment of public resources is necessary to maintain and improve Baltimore's sewage collection system and to enhance compliance with the Clean Water Act. Therefore, the CD requires that Baltimore complete, among other obligations, construction projects, collection system evaluation, rehabilitation projects and any other identified corrective actions to significantly reduce the amount of untreated sewage discharged within approximately 13 years of the lodging of the CD. The bulk of the remedial work imposed through the CD to address the sewage overflows will be established through the sewershed plans.

8.    Baltimore has completed a number of the requirements specified in the CD. According to Baltimore, the work already completed under the CD projects has amounted to approximately $710 million. The City completed most of the 26 projects listed in Appendix D of the CD, resulting in: the elimination of 60 out of 62 known sanitary sewer overflow structures; increasing the capacity of the Jones Falls Pumping Station from 35 million gallons per day (MGD) to 55 MGD; design and construction of a 20 MGD wet weather pumping station in Stony Run; approximately 15 miles of additional or replaced relief sewers; about 29 miles of sewer rehabilitation; and the separation of the remaining combined sewer systems in the city. Baltimore also completed a thorough inspection and

assessment of its eight sewersheds that include among others infiltration and inflow (I/I) evaluation and identifying structural improvement projects.

9.    The City has requested an extension of time to complete the elimination of the two remaining sanitary sewer overflow structures, identified as SSO Structures No. 67 and 72. The City has informed EPA that these overflow structures are affected by a major hydraulic restriction at the City's Back River Wastewater Treatment Plant (WWTP) which can cause problems for approximately ten miles upstream. According to the City, elimination of the overflow structures before completion of the Back River WWTP project to remedy the hydraulic restriction could result in an increase of basement backups and sewage discharges at various locations upstream. EPA is evaluating the City's request and has asked the City for more information on the remaining work.

10.   The City submitted eight sewershed plans by the deadlines specified in the CD. On February 10, 2011, EPA disapproved those plans because EPA concluded that after implementation of the proposed improvements, a significant number of sanitary sewer overflows would still remain thus posing human health and water quality concerns. Since that time, EPA, MDE and Baltimore have met regularly to discuss the changes necessary to the sewershed plans and have exchanged frequent correspondence on these issues. Baltimore City proposed reevaluating its sewershed studies based on a continuous simulation approach and submitted a white paper outlining this approach to EPA on June 30, 2011. EPA reviewed the white paper and followed up with a request that Baltimore compare the results of a continuous simulation technical memorandum for one sewershed to the results of a 10-year, 24-hour synthetic design storm for the same sewershed. The City submitted this comparison on December 30, 2011 and EPA provided comments and feedback to Baltimore. On December 28, 2012, the City submitted a *Sewershed Study and Plan Amendment,* and on February 28, 2013 *Phase 1 Adaptive Management Technical Memorandum.* EPA reviewed these plans and requested additional information from Baltimore. On April 11, 2013, Baltimore submitted a *Response to Request for Comments on the Phase 1 Adaptive Management TM and the Sewershed Study and Plan Amendment.* EPA is currently preparing a response for the April 11, 2013 submittal.

11.   Additional projects proposed in the revised sewershed plans and associated documents include but are not limited to the following: installation of 36 million gallons of storage at the Back River WWTP, projects to remedy the hydraulic restriction at the Back River WTP structural improvement projects, meter basin rehabilitation / comprehensive inflow/infiltration removal projects, and conveyance system capacity upgrades.

12.   A Sanitary Discharge of Unknown Origin (SDUO) is a suspected dry weather sewage discharge that has not been tracked to the City's sewage collection system. A SDUO can be caused by circumstances such as a sanitary sewer infiltrating into the storm sewer system and discharging through a storm water outfall or an illegal connection of a private sewer line into the storm sewer system.

13.   Although the CD does not require that the City report SDUOs, and as a result of Agency

oversight of the CD, EPA requested that Baltimore investigate the source of the SDUOs, develop a method for quantifying the volume of the discharge, and report and update SDUOs in the quarterly reports that the City submits to EPA in accordance with the CD, thus improving reporting requirements. EPA has instructed the City to follow the requirements of the CD whenever the City determines that that a SDUO is actually a sanitary sewer overflow. On specific occasions, EPA has urged the City to prioritize investigation of SDUOs.

14.     As result of EPA's request, Baltimore developed a SDUO protocol, which the City submitted to EPA for review, and which the City finalized on November 12, 2010. Since July 29, 2009 the City has been including information on SDUOs on its quarterly reports.

15.     Since I began compliance oversight of the CD in late 2008, EPA and MDE have demanded approximately $600,000 in stipulated penalties from Baltimore for sanitary sewer overflows from its sanitary sewage collection system for calendar years 2006-2010. Baltimore has paid the demanded stipulated penalties in full. EPA is examining the reports of overflows for calendar years 2011 and 2012 and is working on assessing a demand for stipulated penalties for those overflows for approximately $425,000. Since Baltimore has met other CD requirements, EPA has only demanded stipulated penalties for sanitary sewer overflows.

16.     EPA has exercised its discretion to waive stipulated penalties from some overflows. For example, on September 30, 2010 and October 1, 2010 Baltimore experienced sanitary sewer overflows due to severe wet weather conditions that resulted in intense rainfall conditions over the City's service area. EPA did not assess penalties for those overflows resulting from rainfall conditions equivalent to the 10-year, 24-hour storm event and the 25-year, 24 hour storm event (both associated with a 100-year, 24-hour storm event).

17.     When an atypical and catastrophic event such as a hurricane strikes, EPA could consider whether to exercise its enforcement discretion to address non-compliance regarding sanitary sewage discharges.

18.     Baltimore submitted an Emergency Response Plan ("ERP") to EPA in accordance with the requirements of the CD. EPA and MDE approved Baltimore's Emergency Response Plan in May 2003. Baltimore has submitted annual updates to the plan since 2007. The ERP describes in Section 2 how to estimate overflow volumes. Section 8 of the ERP describes the public media notification procedures. For spills of 10,000 gallons or greater, the City will issue press releases. For spills of less than 10,000 gallons public notification under the ERP is discretionary.

19.     EPA has met with Blue Water Baltimore on several occasions, has had telephones communications and has exchanged email correspondence, to discuss Blue Water Baltimore's concerns. EPA also responded to Blue Water Baltimore's FOIA request for CD related documents, documents related to EPA's municipal separate storm sewer system enforcement action, WWTP NPDES Permits and discharge monitoring reports (DMRs). EPA provided Blue Water Baltimore with specific instructions on gathering

Baltimore City's DMR data. EPA also copied and produced several years worth of documentation submitted by Baltimore in accordance with the CD, and invited Blue Water Baltimore to come to EPA Region III to make any additional copies of CD-related documents. EPA has also held conference calls with Baltimore City to discuss Blue Water Baltimore's concerns and requested a written response from the City addressing those concerns. On May 24, 2013, Baltimore sent EPA a letter responding to the allegations raised by Blue Water Baltimore.

20. In addition to a sanitary sewer system, Baltimore has a municipal separate storm sewer system ("MS4"). The MS4 collects and discharges storm water. Baltimore has a National Pollutant Discharge Elimination System permit for the discharges of storm water through its MS4. The MS4 Permit is outside the scope of the CD. The permit was issued in 2005 and expired in 2010 but it still applies by administrative extension. The MS4 permit requires that Baltimore implement an illicit discharge detection and elimination program to eliminate non-stormwater discharges, which would include sewage discharges, from its MS4. MDE has proposed a new MS4 permit for Baltimore. Blue Water Baltimore submitted comments to MDE on the proposed permit.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 27, 2013

Allison Graham
EPA Region III
Philadelphia, Pennsylvania