IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, and The STATE OF MARYLAND | ) ) ) | |
| *Plaintiffs*, | ) ) ) | Civil Action No. 1:02-CV-01524-JFM |
| v. | ) ) ) | |
| MAYOR AND CITY COUNCIL OF BALTIMORE, MARYLAND, | ) ) ) | |
| *Defendants*. | ) ) ) | |

## PLAINTIFFS' MEMORANDUM IN RESPONSE TO BLUE WATER BALTIMORE'S MOTION FOR LEAVE TO INTERVENE

The United States of America ("United States") and the State of Maryland ("Maryland") (collectively "Plaintiffs") file this response conditionally supporting Blue Water Baltimore's ("BWB" or "Proposed Intervenor") Motion for Leave to Intervene ("Motion"). Because BWB filed its motion in a timely manner, the Plaintiffs do not oppose the Motion. However, for the reasons discussed herein, the Plaintiffs respectfully request that the Court impose reasonable limitations on BWB's intervention as discussed herein.

## BACKGROUND

On April 26, 2002, the Plaintiffs filed a complaint against the City of Baltimore ("Baltimore") alleging that Baltimore violated the Clean Water Act ("CWA") by allowing untreated sewage from its sanitary sewer collection system to be discharged into surrounding waterways. *See* Compl., ECF No. 1. Plaintiffs concurrently lodged a proposed Consent Decree which was entered as final judgement by this Court on September 30, 2002 ("2002 Consent

Decree"). *See* Consent Decree, ECF No. 4. Pursuant to the 2002 Consent Decree, Baltimore was required to pay a civil penalty in the amount of $600,000 and design and implement measures that will upgrade its sanitary sewer system infrastructure in order to prevent any further combined sewer overflows ("CSOs") and significantly reduce the number of sanitary sewer overflows ("SSOs"). *Id.*

Under the 2002 Consent Decree, Baltimore was required to eliminate any remaining combined sewers in the collections system, eliminate structures for sanitary sewer overflows, conduct thorough evaluations of and characterize its eight sewersheds, propose rehabilitation measures for each sewershed and implement such measures after approval by the Plaintiffs. 2002 Consent Decree at ¶¶ 8–11. Further, the 2002 Consent Decree required Baltimore to design and implement an emergency response plan, report discharges to the public, and submit plans for future corrective action in its sewersheds to the Plaintiffs for approval. 2002 Consent Decree at ¶¶ 9, 16. Because the parties recognized that there would still be overflows while Baltimore designs and implements its compliance measures, the 2002 Consent Decree requires Baltimore to pay stipulated penalties for failure to meet specific milestones identified in the 2002 Consent Decree for certain overflows from its collection system. 2002 Consent Decree at ¶ 23. After deliberation, the parties agreed to a final compliance deadline to achieve all requirements of January 1, 2016. *Id.*

Since entering into the 2002 Consent Decree, Baltimore has completed numerous construction projects to improve its sanitary sewer system. The work Baltimore has done includes removing SSO outfalls, rehabilitating pumping stations, valves and other infrastructure, and evaluating its collection system in order to propose and implement additional corrective actions. Exhibit 1. Declaration of Michelle H. Price-Fay [hereinafter "Price-Fay Decl."] ¶¶6, 7,

8.  Through these efforts, Baltimore has successfully eliminated 60 of the 62 known SSO structures; increased the capacity of its Jones Falls Pumping Station from 35 million gallons per day ("MGD") to 55 MGD; designed and constructed a 20 MGD wet weather pumping station in Stony Run; added or replaced about 15 miles of relief sewers; rehabilitated approximately 29 miles of sewer; separated the remaining combined sewer systems in the city; and completed a thorough inspection and assessment of its eight sewersheds to identify future improvement projects.  Price-Fay Decl. at ¶ 7, 8, 9. Costs of the work already completed by Baltimore has amounted to approximately $860 million. *Id.* at 7.

In monitoring Baltimore's progress towards achieving compliance with the 2002 Consent Decree, the Plaintiffs have actively enforced provisions of the 2002 Consent Decree against Baltimore by reviewing and at times demanding revisions to Baltimore's plans for achieving compliance, and assessing stipulated penalties for SSOs.  Price-Fay Decl., at ¶¶ 6, 9, 10, 13, 15, & 16.  The Plaintiffs have also met with and provided information to BWB regarding enforcement of the 2002 Consent Decree.  *Id*. at ¶ 19.  In addition to working with the Plaintiffs, BWB attempted to intervene in this matter, but its motion was denied as untimely by both this Court and the Fourth Circuit Court of Appeals.  *Blue Water Baltimore v. Mayor & City Council of Baltimore, Md.*, 583 F. App'x 157, 158 (4th Cir. 2014).

Despite work completed by Baltimore under the Consent Decree, it became apparent in 2011 that an extension of the 2002 Consent Decree's implementation deadline would be necessary in order to complete priority projects and implement Baltimore's plan to rehabilitate its sewersheds based on the sewershed plans and fully address the sewage overflow problem in a technically efficient manner.  Price-Fay Decl. at ¶ 15, 16, 17.

As required under the 2002 Consent Decree, Baltimore submitted rehabilitation plans for its eight sewershed by 2010. *Id*. at ¶ 9. The plans considered peak flows resulting from storm events of different magnitudes, but the rehabilitation measures proposed in the plans would address only overflows resulting from 2-year, 24-hr storms, meaning that the system would still be vulnerable to more severe weather events or multiple less-severe storms occurring within a short time period. *Id*. Because of this, in February of 2011 the Plaintiffs rejected these plans and demanded revisions. *Id*. In revising its plans and determining the amount of time and financial resources that would be required to make meaningful improvements to the sanitary sewer system, it was determined that extending the compliance deadline would be necessary. Price-Fay Decl. at ¶ 15.

After extensive and thorough negotiations, the Parties came to an agreement on terms for a proposed Modified Consent Decree. *Id*. at ¶ 17. On June 1, 2016, the United States moved to reopen the case and filed the proposed Modified Consent Decree with the Court, and opened a public comment period for the proposed Modified Consent Decree which closed on August 8, 2016. ECF Nos. 28 and 29, Exh. 1, and 81 Fed. Reg. 36584 (June 7, 2016), *available at* https://www.federalregister.gov/articles/2016/06/07/2016-13330/notice-of-lodging-of-proposed-modification-to-consent-decree-under-the-clean-water-act. In addition, on June 7, 2016, representatives from the U.S. Environmental Protection Agency ("EPA"), Maryland Department of the Environment ("MDE"), and Baltimore held a public meeting at which they gave a presentation to citizens and interested parties on the Modified Consent Decree and invited written comments. Price-Fay Decl. at ¶ 19; *see* U.S. Envtl. Prot. Agency, et al., *Baltimore SSO Consent Decree, 2002-2016* (June 7, 2016), *available at* http://publicworks.baltimorecity.gov/pw-bureaus/water-wastewater/wastewater/consent. Over

75 people, including representatives from Blue Water Baltimore, attended the meeting and expressed concerns.  *Price-Fay Decl.* at ¶ 19.

During the public comment period, over a dozen comments were submitted by a variety of groups and citizens.  *Id.* at 19.   On July 27, 2016, shortly before the public comment period ended, BWB submitted its Motion for Leave to Intervene which is now before the Court.  ECF No. 31.  On August 10, 2016, after the close of the public comment period, the Plaintiffs met with BWB and other environmental groups who had submitted written comments to the Modified Consent Decree to discuss the concerns raised in their comments with the Modified Consent Decree.  *Price-Fay Decl.* at ¶ 20.  The United States and Maryland will consider their comments, in addition to the others received. If after consideration of the comments Plaintiffs find that the comments do not disclose information that reveals the Modified Consent Decree is not fair, reasonable, in the public interest or the product of collusion, Plaintiffs will file a motion to enter and respond to the comments accordingly. If Plaintiffs determine that changes to the Modified Consent Decree are warranted, the Plaintiffs will incorporate the changes and thoroughly describe them to the Court in any motion seeking entry. The Plaintiffs will also submit further briefing on how the Consent Decree, as amended, meets the standard for entry. At the time it files its brief, the United States will file the full versions of all written comments along with the Plaintiffs' responses to the issues raised in the comments, with the Court.

## ARGUMENT

The Plaintiffs do not oppose BWB's Motion for Leave to Intervene because it was filed in a timely manner and BWB has a right to intervene pursuant to the CWA. 33 U.S.C. § 1365(b)(1)(B).  However, granting BWB's intervention does not allow it unfettered license to change the scope of the matter at hand or supplant the extensive efforts by the Plaintiffs to

resolve the issues in this case as fairly and expeditiously as possible.  Therefore, because doing

so would allow BWB the opportunity to raise its concerns while allowing for the efficient

resolution of this matter, the Plaintiffs respectfully request that the Court limit the scope of

BWB's intervention to: 1) filing legal briefs commenting on or objecting to the Modified

Consent Decree after a motion to enter has been filed; and 2) filing a timely appeal should the

Modified Consent Decree be entered over BWB's objection.

I.    **THE PLAINTIFFS DO NOT OPPOSE BWB'S MOTION BECAUSE IT IS TIMELY FILED AND BWB HAS A RIGHT TO INTERVENE UNDER THE CWA.**

The Plaintiffs are not opposing BWB's Motion because it was filed in a timely manner

and because BWB has a right to intervene pursuant to the CWA, 33 U.S.C. § 1365(b)(1)(B).

There are three ways in which a party can intervene in a case under Rule 24 of the Federal Rules

of Civil Procedure.  Fed. R. Civ. P. 24(a)–(b).  First, a party is entitled to intervene as a matter of

right if a federal statute gives it an "unconditional right" to do so.  Fed. R. Civ. P. 24(a)(1); 33

U.S.C. § 1365(b)(1)(B) (allowing any citizen as a matter of right to intervene in government

enforcement actions under the CWA).  Second, a party has the right to intervene under Rule

24(a) if it has an interest relating to the matter before the court and none of the existing parties

adequately represent that interest.  Fed. R. Civ. P. 24(a)(2); *see also In re Sierra Club*, 945 F.2d

776, 779 (4th Cir. 1991) (allowing a party to intervene where the government's action may not

adequately represent the party's interests).  Finally, a party may be permitted to intervene by a

court if it has a claim sharing common issues of law and fact with the main action.  Fed. R. Civ.

P. 24(b)(1)(B).  In any of these three situations, the party requesting to intervene must do so "on

timely motion."  Fed. R. Civ. P. 24(a) & (b); *Gould v. Alleco, Inc.*, 883 F.2d 281, 286 (4th Cir.

1989), *cert. denied*, 493 U.S. 1058 (1990).  In determining whether a motion to intervene is

timely, the Fourth Circuit Court of Appeals has held that a court must consider "how far the suit has progressed, the prejudice which delay might cause other parties, and the reason for the tardiness in moving to intervene." *Gould*, 883 F.2d at 286.

In this case, unlike in its previous attempt to intervene after the 2002 Consent Decree had been settled for over a decade and no pending issues were before the Court, BWB's Motion is timely. It falls into the first category under Fed. R. Civ. P. 24, because the CWA grants BWB the right to intervene and both the United States and the State of Maryland are in the process of actively litigating a civil enforcement action. 33 U.S.C. § 1365(b)(2)(B). The statute expressly states that where the EPA or a state is diligently litigating an action under the CWA, "any citizen may intervene as of right." *Id.* The United States and State of Maryland are diligently litigating an active case under the CWA, and so BWB may intervene in accordance with the statute.

Thus, in contrast to BWB's 2013 filing, Plaintiffs do not dispute the timeliness of the motion to intervene because it was filed soon after the Plaintiffs filed a motion to reopen the case for the purpose of lodging a revised consent decree. *See Gould*, 883 F.2d at 286. However, because the Motion was filed before the public comment period closed and before the comments could be considered and therefore before the a final determination on entry of the Modified Consent Decree is known, BWB's issues may well be mooted or otherwise limited. For these reasons, the Plaintiffs do not oppose the Motion, and request the contours of the intervention be established as discussed below.

## II. LIMITING THE SCOPE OF BWB'S INTERVENTION IS PROPER BECAUSE DOING SO WILL ALLOW BWB TO HAVE A VOICE WHILE ENSURING A FAIR, PROMPT, AND EFFICIENT RESOLUTION OF THE ISSUE.

The Court should limit the scope of BWB's intervention because doing so will allow BWB to assert its interest in this case while ensuring that the matter is resolved in a fair, timely,

and efficient manner by keeping primary enforcement authority with the original government

Plaintiffs.  Limiting the scope of BWBs intervention to filing briefs and appealing entry of the

Modified Consent Decree over its possible objections will allow the Plaintiffs to continue to

carry out their responsibility as primary enforcers of the CWA.  And even though it cannot

expand the scope of the litigation, BWB has had an opportunity to thoroughly discuss its position

and comments with the Plaintiffs, and the Plaintiffs must carefully consider and respond to these

comments when determining how to seek entry of the proposed Modified Consent Decree.  As

an Intervenor, BWB will also be able to submit a brief and fully argue its position if it believes

the Modified Consent Decree is not fair, reasonable, and in furtherance of the public interest or is

illegal or a product of collusion.

Although Rule 24 may give a party a right to intervene, a court still may impose

reasonable restrictions in order to ensure the efficient adjudication of the case.  *United States v.*

*Duke Energy Corp.*, 171 F.Supp.2d 560, 565 (M.D.N.C. 2001) (citing Fed. R. Civ. P. 24

advisory committee notes to 1966 amendments).  "'An intervenor is admitted to the proceeding

as it stands, and in respect of the pending issues, but is not permitted to enlarge those issues or

compel an alteration of the nature of the proceedings.'"  *United States v. DeKalb Cnty., Ga.*,

Case No. 1:10-cv-4039-WSD, 2011 WL 6369569, at *9  (N.D. Ga. Oct. 11, 2011) (*quoting*

*Vinson v. Wash. Gas Light Co.*, 321 U.S. 489, 498 (1944)); *Local No. 93, Int'l Ass'n of*

*Firefighters v. Cleveland*, 478 U.S. 501, 529 (1986) (holding that an intervenor cannot block a

court's decree simply by withholding its consent) (citations omitted); *Duke Energy Corp.*, 171

F.Supp.2d at 565 (finding that party's unconditional right to intervene does not bar a court from

ensuring efficiency by imposing reasonable limitations on the scope of the intervention) (citing

*Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370, 383 (1987) (Brennan, J., concurring)).

Rule 24 does not allow private parties, even intervenors as of right, the ability to "hijack" proceedings where the government is diligently engaged in enforcing the law. *United States v. Lexington-Fayette Urban Cnty. Gov't*, Case No. 06-386-KSF, 2007 WL 2020246, at *4 (E.D. Ky. July 6, 2007).  In determining whether or not to approve a consent decree, a court must decide whether the consent decree "is fair, adequate, and reasonable" and "not illegal, a product of collusion, or against the public interest."  *United States v. North Carolina*, 180 F.3d 574, 581 (4th Cir. 1999).

"The presumption in favor of settlement is particularly strong where a consent decree has been negotiated by the Department of Justice on behalf of a federal administrative agency specially equipped, trained, or oriented in the field. EPA is such an agency." *United States v. Cannons Eng'g Corp*., 720 F. Supp. 1027, 1035 (D. Mass. 1989), *aff'd*, 899 F.2d 79 (1st Cir. 1990) (holding that the consent decree was fair and reasonable and should be approved); *see also American Canoe Ass'n, Inc. v. U.S. Envtl. Prot. Agency*, 54 F.Supp.2d 621, 625 (E.D. Va. 1999) ("[W]here a government agency charged with protecting the public interest has pulled the laboring oar in constructing the proposed settlement, a reviewing court may appropriately accord substantial weight to the [agency].") (quoting *Bragg v. Robertson,* 54 F.Supp.2d 653, 660 (S.D. W.Va. 1999)) (internal quotation marks omitted); *North Carolina,* 180 F.3d at 583 ("[C]onsidering whether to enter a proposed consent decree, a district court should be guided by the general principle that settlements are to be encouraged.").

The states and federal government are the primary enforcers of the  CWA, and courts have held that citizen suits and citizen intervention merely supplement, not supplant, federal  and state

9

enforcement. *See Gwaltney of Smithfield, Inc. v. Chesapeake Bay Found.*, 484 U.S. 49, 60 (1987) (finding that Congress intended for the Government to bear primary enforcement responsibility and citizen suits play a supplementary role) (citing S. Rep. No. 92–414, p. 64 (1971)); *EPA v.  City of Green Forest*, 921 F.2d 1394, 1402 (8th Cir. 1990) (holding that the CWA "was not intended to enable citizens to commandeer the  federal enforcement machinery.") (citing *DuBois v. Thomas*, 820 F.2d 943, 949 (8th Cir. 1987)); *United States v. Metropolitan Water Reclamation Dist. of Greater Chicago*, 792 F.3d 821, 824–25(7th Cir. 2015) [hereinafter "*Chicago*"] (finding that an intervening party cannot supplant the government's case where it is diligently enforcing the CWA); *Lexington-Fayette*, 2007 WL 2020246, at *3 ("Even assuming that  the Intervening Plaintiffs are permitted to intervene in this matter, this does not necessarily grant  them an automatic 'seat at the table.'").  Thus, while an intervening party can have the right to introduce evidence, appeal decisions, and enforce judgment, it cannot carry on as if it were bringing a separate suit. *Chicago*, 792 F.3d at 825.

Even if the scope of the intervention is limited to filing briefs responding to a motion to enter the Modified Consent Decree or to appealing an adverse ruling on it, BWB will still be afforded full opportunity to voice its concerns, both as a public commenter and as an intervening party.  At a minimum, the concerns raised by BWB in its Motion will be addressed in accordance with the standard procedures providing for public participation in connection with environmental settlements. At  this point, the public comment period for the Modified Consent Decree has closed.  *See* 81 Fed. Reg. 36584.  Now that the public (including BWB) has had the opportunity to submit comments, the United States must consider all the comments to determine if they disclose facts or considerations which indicate that the proposed Modified Consent Decree is inappropriate, improper or inadequate.  *See North Carolina*, 180 F.3d at 583; *American Canoe*,

54 F.Supp.2d at 625.  The Plaintiffs will then file responses to all comments with the Court, and either: 1) withdraw the proposed Modified Consent Decree; 2) request this Court to approve and enter the Modified Consent Decree; or 3) seek to modify it further.  If allowed to intervene BWB will have the opportunity, in addition to submitting its comments, to present and argue its point of view before the Court by opposing a motion to enter the Modified Consent Decree if BWB believes it is not fair, reasonable, or consistent with the public interest.  *See North Carolina*, 180 F.3d at 583.

While limiting the scope of BWB's intervention would not inhibit its ability to respond (or object) to terms in the proposed Modified Consent Decree, not limiting the scope would certainly prejudice the parties in this case who have invested an enormous amount of resources into diligently resolving this matter in as quick and efficient a manner as possible.  The parties have negotiated the terms of the proposed Modified Consent Decree after years of designing, implementing, and redesigning plans to make much-needed improvements to Baltimore's sanitary sewer system as quickly as possible without burdening its citizens.  Allowing BWB free rein to extend discovery or otherwise use its intervention to expand the scope of the issue beyond whether the Modified Consent Decree meets the standard for entry would, at a minimum, unnecessarily delay the implementation of remedial efforts that have been extensively reviewed to ensure Baltimore's compliance with the CWA.  Further delay may undermine the Plaintiffs ability to efficiently carry out its responsibility to enforce the CWA and ensure Baltimore takes all necessary measures to protect the health of its citizens.  Courts have recognized the secondary role of intervening plaintiffs in enforcement  proceedings by the government entities, and doing so here is necessary for the Court to ensure that this matter is resolved quickly, efficiently, and fairly.

**CONCLUSION**

For the foregoing reasons, the Plaintiffs do not oppose Proposed Intervenor BWB's Motion for Leave to Intervene given that BWB has a right to intervene through the CWA, and its Motion was filed in a timely manner.  However, the ultimate responsibility to enforce the CWA and oversee the implementation of the proposed Modified Consent Decree rests with the government Plaintiffs.  Given the interest of the Court and all the parties in ensuring that the requirements of the Modified Consent Decree are fulfilled as fairly, promptly, and efficiently as possible, the Plaintiffs respectfully request that the Court restrict BWB's intervention to filing briefs commenting on or objecting to the Modified Consent Decree and filing an appeal should the Modified Consent Decree be entered over its objection.

Respectfully Submitted,

FOR THE UNITED STATES:

ROD J. ROSENSTEIN
United States Attorney

JOHN C. CRUDEN
Assistant Attorney General
Environment & Natural Resources Division
United States Department of Justice

/s/ Cara M. Mroczek
CARA M. MROCZEK
Trial Attorney

U.S. Department of Justice
Environment & Natural Resources Division
Environmental Enforcement Section
P.O. Box 7611, Ben Franklin Station
Overnight Mail: ENRD, Room 6126
601 D St. N.W.
Washington, D.C.  20044-7611
Phone: 202-514-5315
Email: cara.mroczek@usdoj.gov

OF COUNSEL:

Nina Rivera
Assistant Regional Counsel
U.S. Environmental Protection Agency
1650 Arch St. (3RC42)
Philadelphia, PA 19103

FOR THE STATE OF MARYLAND:

BRIAN E. FROSH
Attorney General for the State of Maryland


/s/ Nancy W. Young
NANCY W. YOUNG
Federal Bar No. 08531
Office of the Attorney General
Maryland Department of the Environment
1800 Washington Blvd., Suite 6048
Baltimore, MD 21230
Phone: 410-537-3042
Fax: 410-537-3943
Email: nancy.young@maryland.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 15, 2016, I filed the Plaintiffs' Memorandum in Response to Blue Water Baltimore's Motion for Leave to Intervene using the Court's electronic case filing system, which will send electronic notice of such filing to all counsel of record registered on the case management/electronic filing ("CM/ECF") system including, but not limited to:

Emily A. Vainieri       emily.vainieri@maryland.gov, elaine.hayden@maryland.gov
                        nancy.young@usdoj.gov

Nancy W. Young          nancy.young@maryland.gov

P. Michael Cunningham        michael.cunningham@usdoj.gov, vanessa.davis@usdoj.gov

Patrick M. Phelan       pphelan@cov.com, tbrugato@cov.com, tgarrett@cov.com

Peter E. Keith          pkeith@gejlaw.com, dtaylor@gejlaw.com

Theodore L. Garrett     tgarrett@cov.com

Thomas Mark Lingan tmlingan@venable.com, dsguth@venable.com

Thomas Brugato          tbrugato@cov.com

Thurman W. Zollicoffer, Jr.   tzollicofer@wtplaw.com

                        /s/ Cara M. Mroczek
                        Cara M. Mroczek

# Exhibit 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
    :
UNITED STATES OF AMERICA and    :
The State of Maryland,    :
    :
    *Plaintiffs*,    :
    :
    v.    :    Civil Action No. 1:02-CV-01524-JFM
    :
MAYOR AND CITY COUNCIL OF    :
BALTIMORE, MARYLAND    :
    :    DECLARATION OF Michelle H. Price-Fay
    *Defendant*.    :
    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Michelle H, Price-Fay, pursuant to 28 U.S.C. §1746, declares the following under the penalty of perjury:

1.    I submit this declaration in support of modifications to the Baltimore, Maryland ("City" or "Baltimore") Consent Decree in Civil Action No. 1:02-CV-01524-JFM ("2002 Decree" or "2002 CD"). Except where noted otherwise, I have personal knowledge of the information set herein.

2.    I am employed by the United States Environmental Protection Agency, Region III ("EPA") currently serving as the Associate Director for the Office of State and Watershed Partnerships in the Water Protection Division. I served as the Chief of the National Pollutant Discharge Elimination System (NPDES) Enforcement Branch of the Water Protection Division from January 2011 until May 2016. I have been employed at EPA since December 2002 and I have served in various positions since that time. I received a Bachelor of Science degree from the University of Findlay in Environmental and Hazardous Materials Management with an emphasis in Industrial Hygiene and a minor in Chemistry in 1996.

3.    As the Chief of the NPDES Enforcement Branch I managed the federal CWA compliance and enforcement program and 17 EPA employees who conducted NPDES CWA inspections for EPA Region III. In the NPDES Enforcement Branch, inspectors and case developers develop and monitor CWA administrative and judicial enforcement cases, including the judicial consent decree and compliance monitoring for the City of Baltimore. I was responsible for managing the Federal NPDES compliance and enforcement program, and the EPA CWA NPDES inspectors who conducted and lead

1

municipal wastewater inspections, municipal stormwater audits, and stormwater inspections at construction sites and at industrial and municipal facilities among other tasks. Program management included the review of discharge monitoring data and various technical documents and reports to determine compliance with the Clean Water Act, 33 U.S.C. § 1251 et seq. It also included developing documents relating to Clean Water Act enforcement. Additionally, I managed staff that tracked compliance with formal enforcement action requirements and reviewed and commented on technical documents submitted by regulated entities as required by the associated action. Although I began another position in the Water Protection Division in May 2016, I will continue my involvement in the Baltimore consent decree monitoring and modification until such time that the modified consent decree is entered into federal court. After that time the responsibility for overall management will be revert to the current NPDES Enforcement Branch Chief and the appropriate technical staff assigned for consent decree compliance and oversight.

4.  Prior to working with the NPDES Enforcement Branch I served as the Emergency Planning and Community Right-to-Know Act (EPCRA) Program Coordinator in the Oil & Prevention Branch, the Hazardous Site Clean-up Division of EPA Region III from April 2006 to January 2011. As the Program Manager, I conducted and lead Comprehensive Environmental Response Compensation and Liability Act (CERCLA) and EPCRA inspections at facilities that stored hazardous chemicals, and who were required to report releases to the National Response Center, State Emergency Response Commission and the Local Emergency Planning Committee. In this role I worked with a wide variety of facilities subject to the Federal regulation. I developed and negotiated administrative and judicial enforcement cases representing EPA working on a wide range of regulated entities that include local government subject to the regulations.

5.  Beginning in 2011 I managed staff responsible for tracking compliance with the Baltimore City 2002 CD. Compliance oversight of the Baltimore City 2002 CD includes reviewing and responding to technical documents and reports submitted under the 2002 CD such as Collection System Evaluation and Sewershed Plans (sewershed plans) and technical memorandums; assessing stipulated penalties for sanitary sewer overflows (SSOs) throughout the City's collection system; coordinating and communicating with the Maryland Department of the Environment (MDE) to ensure mutually satisfactory results are achieved; organizing and attending various technical and management meetings with the City and MDE; responding to citizen complaints; responding to Freedom of Information Act requests; and meeting with public interest groups. EPA, specifically Region III, and MDE are the regulatory Agencies responsible for oversight and monitor the City of Baltimore's compliance with the requirements of the 2002 CD.

6.  Baltimore maintains about 1400 miles of sanitary mains, operates two wastewater treatment plants (WWTPs), collects and treats an average flow of 210 million gallons of wastewater daily, and operates 8 major pumping stations. The 2002 CD acknowledges that Baltimore has violated and continues to violate Section 301 of the Clean Water Act by discharging untreated sewage from its sewage collection system to the Back River,

2

Patapsco River, Chesapeake Bay, and several smaller water bodies and recognizes that investment of public resources is necessary to maintain and improve Baltimore's sewage collection system and to comply with the Clean Water Act. Therefore, the 2002 CD requires that in approximately 13 years Baltimore complete, among other obligations, construction projects, collection system evaluation, rehabilitation projects and any other identified corrective actions to significantly reduce the amount of untreated sewage discharged. In addition to the projects specifically listed in the CD, once the City characterized the City's collection and conveyance system it was required to identify remedial work to address the sewage overflows. The City had to submit this remedial work in eight sewershed plans to the Agencies for review and approval. The sewershed plans once approved would become enforceable under the 2002 CD.

7.   Baltimore has completed a number of the requirements specified in the 2002 CD. According to Baltimore, the work already completed under the 2002 CD has amounted to more than $860 million dollars. The City completed the majority of the 26 projects listed in Appendix D of the 2002 CD, that resulted in: the elimination of 60 out of 62 engineered sanitary sewer overflow structures that the City was aware at the time of lodging the 2002 CD; an increase in the capacity of the Jones Falls Pumping Station from 35 million gallons per day (MGD) to 55 MGD; design and construction of a 20 MGD wet weather pumping station in Stony Run; repair or replacement of approximately 163 miles of sewer lines; and the separation of the remaining combined sewer systems in the city. Baltimore also completed a thorough inspection and assessment of each of its eight sewersheds, that included, among others, monitoring rainfall and flow, evaluating infiltration and inflow (I/I), inspecting over 30,000 manholes and over 1,000 miles of sewer pipes and identifying hydraulic and structural improvement projects that were designed to address identified defects.

8.   In addition, pursuant to Paragraph VI.12 of the 2002 CD, the City developed a collection and transmission system model (e.g. the hydraulic model) for the sewage collection system. In January 2005 EPA approved Baltimore's Model Project Approach Report which set "forth a project approach and detailed schedule of development, installation and implementation of the Model for the Collection System." (Paragraph VI.12.C of the 2002 CD.) The purpose of the model, among others, is to evaluate the impact to the collection system from I/I rehabilitation projects and upgrades proposed in the sewershed plans required by the 2002 CD.

9.   The City submitted its eight sewershed plans by the deadlines specified in the CD, with the last three sewershed plans being submitted by July 1, 2010. On February 10, 2011, EPA and MDE disapproved those plans because the Agencies concluded that after implementation of the proposed improvements, which were based on a 2-year, 24-hour synthetic design storm, a significant number of sanitary sewer overflows would still remain thus posing human health and water quality concerns.

10.   It is common for municipalities to discover issues that they were not previously aware of when completing a thorough assessment of an aging sewage collection system. This is

because these systems were installed many decades ago and run for hundreds of miles underneath the ground where problems are not visually apparent. During Baltimore's inspection and assessment of its eight sewersheds, Baltimore discovered the existence of a major hydraulic restriction at the City's Back River Wastewater Treatment Plant (WWTP). This meant that sewage conveyance to the WWTP does not flow freely but instead can back up, and according to Baltimore, can cause sewage overflow problems for approximately ten miles upstream. Addressing the hydraulic restriction is a significant project. According to Baltimore, it originally estimated that it would cost around $350 million; however, the lowest bid the City initially received was about $440 million. This resulted in Baltimore having to reevaluate the scope and the budget for the project in order rebid the effort through another bid process.

11.    Compounding this issue, modelling also showed that closing the remaining SSO structures could result in additional problems with collection and conveyance system capacity. This demonstrated the need to further evaluate and to prioritize the implementation of the necessary rehabilitation projects across the sewage collection and conveyance system as a whole.

12.    Since the disapproval of the eight sewershed plans, EPA, MDE and Baltimore have met regularly to discuss the necessary changes for the sewershed plans and have exchanged frequent correspondence on these issues. Although the 2002 CD required modeling of separate sewersheds, Baltimore City proposed to reevaluate its sewershed plans based on a system-wide model rather than by an individual sewershed. The system-wide model takes into account interrelationships between adjacent sewersheds. Using this approach Baltimore can identify hydraulic and structural improvement projects by integrating the response of the entire sewage collection system, instead of sewersheds independent of one another, as previously done. Thus the work contemplated in the sewershed plans that Baltimore previously submitted needed to be revised using the system-wide approach.

13.    Baltimore also proposed using a continuous simulation approach to reevaluate the sewershed plans which allowed the City to model the response in the collection system considering peak flows, rather than to peak rainfall. Modeling based on peak flow, rather than a synthetic design storm using peak rainfall, depicts the response of the collection system to peak flow from successive smaller rain events and not only the response to large rain storms.

14.    Baltimore submitted a paper outlining this continuous simulation approach to EPA and MDE on June 30, 2011. EPA reviewed the paper and followed up with a request that Baltimore compare the results of a continuous simulation technical memorandum for one sewershed to the results of a 10-year, 24-hour synthetic design storm for the same sewershed. The City submitted this comparison on December 30, 2011 and EPA provided comments and feedback to Baltimore. On December 28, 2012, the City submitted a *Sewershed Study and Plan Amendment,* and then on February 28, 2013 a *Phase 1 Adaptive Management Technical Memorandum.* EPA reviewed these plans and requested additional information from Baltimore. On April 11, 2013, Baltimore

4

submitted a *Response to Request for Comments on the Phase 1 Adaptive Management TM and the Sewershed Study and Plan Amendment.* EPA reviewed Baltimore's April 11, 2013 response.

15.    The City requested an extension of time beyond the January 2016 deadline in the 2002 CD to complete the projects identified in the revised sewershed plans. Baltimore's request for an extension included the use of system-wide peak flow modeling and a phased adaptive management approach to implement rehabilitation projects in two phases.

16.    After reviewing the revised sewershed plans, considering the peak flow system-wide modeling, the request for extension and the two phase adaptive management approach, on November 1, 2013, the Agencies approved the December 28, 2012 *Sewershed Study and Plan Amendment,* February 28, 2013 *Phase 1 Adaptive Management Technical Memorandum* and the April 11, 2013 *Response to Request for Comments on the Phase 1 Adaptive Management TM and the Sewershed Study and Plan Amendment.*

17.    Over the following two years, I participated in numerous meetings and teleconferences to discuss the basis and the provisions for a modification to the 2002 CD with the staff from DOJ, EPA, MDE and Baltimore. I had weekly and sometimes daily calls with staff from DOJ to discuss and edit many CD drafts. During this time, we collected additional information and data from Baltimore to develop the terms of the modified Consent Decree. On June 1, 2016, the proposed modification to the 2002 CD ("Modified CD") was lodged with the Court.

18.    I and other EPA, MDE and City of Baltimore representatives have met with Blue Water Baltimore on several occasions to discuss their concerns with the City's compliance with the 2002 CD. In addition EPA has had several meetings, telephone communication and exchanged email correspondence, to discuss Blue Water Baltimore' concerns. EPA also responded to several of Blue Water Baltimore Freedom of Information Act (FOIA) request for CD related documents, documents relating to EPA's municipal separate storm sewer system enforcement action, WWTP NPDES Permits and discharge monitoring reports (DMRs). In addition EPA has held conference calls with Baltimore City to discuss Blue Water Baltimore's concerns and requested written response from the City addressing those concerns.

19.    On June 7, 2016, following the lodging of the Modified CD, I together with other representatives from EPA, MDE and the City of Baltimore held a public information meeting in the City of Baltimore to discuss the Modified CD. The meeting was open to all interested parties. During the meeting the regulatory Agencies and the City of Baltimore presented information to approximately 75 attendees, including representatives of Blue Water Baltimore, to discuss progress and compliance with the 2002 CD, information considered for the modification and the changes detailed in the Modified CD. During the public meeting the Agencies and the City encouraged citizens and interested parties to formally comment on the Modified CD. At close of the public comment period, over a dozen comments were submitted by a variety of groups and citizens.

20.     On August 10, 2016, I and other representatives from EPA, MDE and the Department of Justice met with Blue Water Baltimore and other environmental groups who submitted formal comments during the public comment period for the Modified CD.  The agencies approached these organizations to better understand the comments submitted.

21.     EPA and MDE have demanded approximately $1.8 million in stipulated penalties from Baltimore for sanitary sewer overflows from its sanitary sewage collection system, pursuant to the stipulated penalties provision of the 2002 CD.  Baltimore has paid the demanded stipulated penalties in full.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___8/15/16___

Michelle H. Price-Fay
EPA Region III
Philadelphia, Pennsylvania