UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, et al., | ) | Civil Action No. JFM-02-1524 |
| Plaintiffs, | ) ) ) | |
| and | ) ) | |
| BLUE WATER BALTIMORE, | ) ) ) | |
| Applicant for Intervention. | ) ) | |
| v. | ) ) ) | |
| MAYOR AND CITY COUNCIL OF BALTIMORE, MARYLAND, | ) ) ) | |
| Defendant. | ) | |

---

## COMPLAINT IN INTERVENTION

---

For its Complaint in Intervention, Plaintiff-Intervenor Blue Water Baltimore sets forth the following allegations:

## I.   INTRODUCTION

1.      Plaintiff-Intervenor submits this Complaint in Intervention in accordance with Federal Rule of Civil Procedure 24(a) and (b).  The other parties to this case are Plaintiffs the United States of America and the State of Maryland (collectively, "Plaintiffs"), and Defendant the Mayor and City Council of Baltimore, Maryland ("City of Baltimore" or "the City").

2.      The underlying suit in this matter is a Clean Water Act enforcement action brought by Plaintiffs against the City of Baltimore, alleging a number of violations of the Clean

Water Act relating to Baltimore's sewer system and publicly owned treatment works.  In 2002, this Court approved a Consent Decree (the "Consent Decree") obligating the City of Baltimore to undertake a number of actions designed to address the underlying alleged Clean Water Act violations.

3.      The City of Baltimore continues to violate the Clean Water Act and the 2002 Consent Decree.  The City of Baltimore continues to cause sewage system overflows and other sewage incidents which cause extensive water quality contamination and pose a threat to public health and the environment.  Many of these overflows and incidents are violations of both the Clean Water Act and the 2002 Consent Decree.  These violations convincingly establish that oversight and enforcement of the 2002 Consent Decree have been insufficient to ensure compliance.

4.      Plaintiffs and the City of Baltimore filed a proposed modified consent decree (the "Modified Consent Decree") and a motion to reopen the case on June 1, 2016.  The proposed Modified Consent Decree would extend to 2031 the deadline for the City of Baltimore to implement various projects necessary for the City to come into compliance with the Clean Water Act.  In particular, the proposed Modified Consent Decree would extend the deadline for the City to complete the projects that it had been required to complete under the original decree from January 1, 2016 to January 1, 2021, and then require the City to propose and implement a "Phase II" plan, consisting of additional corrective actions, to be completed by December 31, 2030.

5.      While these plans are being implemented, the City's violations of the Clean Water Act continue.  Indeed, in its press release regarding the Consent Decree, the federal Environmental Protection Agency ("EPA") admits that the first phase (consisting of actions taken by January 1, 2021) will only reduce the volume of one category of overflows by 83

2

percent (and does not address the extent to which the Consent Decree is anticipated to reduce other categories of overflows by that date).[1] This means that the public will be subject to unlawful discharges at least until the end of the second phase, at the end of 2030.

6.      Notably, Plaintiffs acknowledge these ongoing violations – the proposed Modified Consent Decree recites that the United States "alleged in 2002 and *continues to allege* that Baltimore has violated and *continues to violate* [the Clean Water Act] by discharging untreated sewage . . . [to] waters of the United States." Proposed Modified Consent Decree at 1 (emphasis added).

7.      Plaintiff-Intervenor has been in communication with EPA, the Maryland Department of the Environment ("MDE"), and the City for years regarding inadequate compliance with the Consent Decree. Plaintiff-Intervenor seeks to intervene in this suit for purposes of addressing the prevalence of unlawful sewage incidents and the impact to the public and the environment of the proposed modifications to the Consent Decree that will allow violations to continue until the year 2031 – or potentially even until 2033. Further, Plaintiff-Intervenor seeks, if necessary, to request a judicial hearing regarding the basis and adequacy of the proposed modifications to the Consent Decree.

## II.      JURISDICTION

8.      This Court has jurisdiction over the subject matter of this action pursuant to 33 U.S.C. § 1365 and 28 U.S.C. § 1331. This Court also has retained jurisdiction over the

---

[1] *See* https://www.epa.gov/newsreleases/us-maryland-amend-agreement-baltimore-city-curtail-sewer-overflows-and-improve-water

EPA has not provided to the public the basis for this 83% assertion, which may well be an over-optimistic estimate.

implementation, enforcement, and modification of the 2002 Consent Decree.   2002 Consent Decree ¶¶ 40, 69.

## III.   VENUE

9.   The City of Baltimore's violations occur in the District of Maryland, and the 2002 Consent Decree was entered in the District of Maryland.   Therefore, venue is proper in the District of Maryland.   33 U.S.C. § 1365(c)(1); 28 U.S.C. § 1391(b).

## IV.   PARTIES

### A.   Plaintiff-Intervenor

10.   Blue Water Baltimore is a nonprofit corporation formed to restore the quality of Baltimore's rivers, streams, and harbor to foster a healthy environment, a strong economy, and thriving communities.   Declaration of Halle Van der Gaag ("Van der Gaag Decl.") ¶¶ 3, 5 (attached as Exhibit A).   Blue Water Baltimore was formed in 2010 as a result of a merger between five separate Baltimore organizations involved in water quality issues.   Van der Gaag Decl. ¶ 4.

11.   Blue Water Baltimore is a "person" within the meaning of the Clean Water Act, 33 U.S.C. § 1362(5), and a "citizen" within the meaning of that Act, 33 U.S.C. § 1365(g).

12.   Blue Water Baltimore has authority to intervene in this suit under 33 U.S.C. § 1365(b).   In the alternative, Blue Water Baltimore has authority to bring suit under 33 U.S.C. § 1365(a)(1), (b)(1).

### B.   Plaintiffs

13.   Plaintiffs in the underlying action are the United States of America and the State of Maryland.

14.   Plaintiffs have authority to bring this lawsuit under 33 U.S.C. § 1319.

C.      **Defendant**

15.     Plaintiffs' complaint, at ¶¶ 8-9, describes the City of Baltimore.

16.     The City of Baltimore is a municipality and political subdivision of the State of Maryland.  The City of Baltimore is a "municipality" within the meaning of 33 U.S.C. § 1362(4), and a "person" within the meaning of 33 U.S.C. § 1362(5).

17.     The City of Baltimore may be sued under 33 U.S.C. § 1365(a).

V.     **STANDING**

18.     Members of Blue Water Baltimore live within and around the City of Baltimore and have been affected by Defendant's sewage discharges.  Van der Gaag Decl. ¶¶ 8-9.  Sewage overflows have adversely impacted the recreational activities of a number of Blue Water Baltimore's members.  *See* Declaration of Debra Lenik ("Lenik Decl.") (attached as Exhibit B); Declaration of Guy Hollyday ("Hollyday Decl.") (attached hereto as Exhibit C).  Blue Water Baltimore members have refrained from engaging in activities that might involve contact with Baltimore's streams and Harbor, as a result of health concerns relating to sewage discharges as well as the unpleasant odor and sight of sewage.  Blue Water Baltimore members have also had their enjoyment of recreational activities diminished as a result of sewage discharges.  Sewage overflows have harmed the well-being of Blue Water Baltimore members who live and work near Baltimore's streams and Harbor, where sewage discharges regularly occur.

19.     The interests that Blue Water Baltimore seeks to protect in this lawsuit are germane to Blue Water Baltimore's purpose.  Blue Water Baltimore has expressed concerns with the City of Baltimore's sewage discharges since its formation in 2010.  Van der Gaag Decl. ¶¶ 6, 12-13.  Blue Water Baltimore's predecessor organizations were involved with these issues since at least 2008.  Van der Gaag Decl. ¶ 12.

20.     The Board of Blue Water Baltimore has approved this motion to intervene.  Van der Gaag Decl. ¶ 13.

21.     Blue Water Baltimore has standing to bring this proposed complaint in intervention.  *See, e.g.*, *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181-84 (2000).

## VI.    LEGAL BACKGROUND

22.     The Clean Water Act's purpose is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."   33 U.S.C. § 1251(a).   The Act prohibits the "discharge of any pollutant" except in compliance with an appropriate permit.   33 U.S.C. § 1311(a).

23.     The term "pollutant" is defined as including "sewage, garbage, sewage sludge, . . . and . . . municipal . . . waste discharged into water."   33 U.S.C. § 1362(6).

24.     Any person in violation of the Clean Water Act may be subject to a civil penalty, assessed on a daily basis for each violation.  33 U.S.C. § 1319(d).

25.     Unpermitted sewage system overflows constitute violations of the Clean Water Act, as they are discharges of raw, untreated sewage from the sewer system without a permit. *See* 33 U.S.C.§ 1311(a).

## VII.   FACTS

### A.    The 2002 Complaint & Consent Decree

26.     Background regarding the history of Baltimore's sewage system can be found in ¶¶ 29-49 of Plaintiffs' original complaint in this action, dated April 26, 2002.  Those paragraphs of the original complaint are hereby incorporated by reference.

27.     On April 26, 2002, Plaintiffs brought suit against the City of Baltimore in this Court, alleging "hundreds of discharges of untreated wastewater containing raw sewage" from

Baltimore's sewage system, "which were not discharged through a permitted outfall and were not authorized under any NPDES permit issued to Baltimore City."  Plaintiffs' Compl. ¶ 42.

28.     The same day Plaintiffs' complaint was filed, a proposed Consent Decree was lodged with this Court.  That Consent Decree was approved on September 30, 2002.

29.     The Consent Decree was designed to require Baltimore to "eliminate Sanitary Sewer Overflows" ("SSOs") and "eliminate all Combined Sewer Overflow discharges" ("CSOs") through the implementation of remedial measures specified in the decree.  Consent Decree ¶ 8.A.

30.     The Consent Decree states that "Baltimore shall remain solely responsible for any non-compliance with the terms of this Consent Decree, all applicable permits, the Clean Water Act, and regulations promulgated under that Act."  Consent Decree ¶ 50.

31.     The Consent Decree requires that "any modification of this Consent Decree by the Parties shall be in writing and filed with the Court before it will be deemed effective . . . . Nothing in this Consent Decree shall be interpreted as modifying the scope and standard of review that the Court will exercise in reviewing a petition for modification."  Consent Decree ¶ 69.

32.     This Court has "retain[ed] jurisdiction of this matter for the purposes of implementing and enforcing the terms and conditions of this Consent Decree."  Consent Decree ¶ 40.

**B.     Developments After Entry of the Consent Decree**

33.     Blue Water Baltimore and its predecessor organizations have been in regular communication with the City of Baltimore, MDE, and EPA regarding concerns with the City's compliance with the Consent Decree since at least 2008.

7

34.     In November 2012, Blue Water Baltimore met with EPA to discuss the City of Baltimore's lack of compliance with the Consent Decree.   Blue Water Baltimore provided documentation of six specific, substantial sewage overflows and incidents at this meeting.  EPA informed Blue Water Baltimore that it was negotiating with the City of Baltimore regarding revisions to the Consent Decree.

35.     On February 28, 2013, Blue Water Baltimore sent a letter to EPA, MDE, and the City of Baltimore, attached as Exhibit D,[2] addressing a number of matters relating to the sewage system, including:

    a.   Documenting six specific examples of sewage overflows and other sewage incidents;

    b.   Documenting significant examples of where the City's compliance with the Consent Decree fell short;

    c.   Requesting that EPA increase its oversight and enforcement of the Consent Decree, including a formal investigation of the City's compliance with the Decree; and

    d.   Requesting that the parties address the limited scope of the Consent Decree, including its failure to adequately address sewage discharges of unknown origin from the stormwater system.

36.     The sewage incidents documented in the attachments to the February 28, 2013, letter included, among other incidents, the following:

---

[2] Due to space and size constraints, Plaintiff-Intervenor is not re-attaching the excerpts of the appendices to the February 28, 2013 letter; they have already been filed in this action as Exhibit D to Rec. Doc. 5-2.

a.  Repeated sewage discharges from a relief pipe (sanitary sewer overflow structure 67) installed near 2050 Falls Road, Baltimore between July and October, 2012.

b.  Repeated sewer overflows near 2050 Falls Road, Baltimore, allowing sewage to enter the stormwater infrastructure through the storm drains and leaving extensive wastewater debris on a heavily-used pedestrian walkway without any notification to the public of such debris.

c.  Wastewater debris indicating discharge of sewage wastewater from the Jones Falls Pumping Station in June 2012, despite the fact that the City's Consent Decree quarterly report indicates that there were no pumping station overflows in the calendar quarter ending 6/30/2012.

d.  A substantial sewage discharge into Baltimore Harbor between June 1 and June 8, 2012.

e.  Numerous instances of sewage overflows from a pair of sewer stacks in the Herring Run between Harford Road and Belair Road, including overflows in May and October 2012, where the volume of the overflows was drastically underreported.

f.  Numerous instances of sewage overflows near 1800 South Clinton Street, including an overflow on October 29, 2012.

All of the foregoing sewage overflows were not routed to the City's water treatment plant and thus resulted in the discharge of untreated sewage to waters of the United States.  These overflows were discharges without a permit and so violated the Clean Water Act, 33 U.S.C. §§ 1311(a), 1342.

37.     Blue Water Baltimore provided the City with sampling results for a number of these incidents, which demonstrated elevated levels of a number of pollutants associated with sewage as a result of the discharges.

38.     Since the 2013 submission, sewage overflows have continued to occur and remain commonplace in Baltimore: in 2014 and 2015, there were at least 1,023 incidents of sewer overflows reported by Baltimore City, responsible for discharging at least 10.6 million gallons of raw sewage.  Van Der Gaag Decl. ¶ 11.

39.     Blue Water Baltimore has continued to document chronic sewage overflows in Baltimore, and to report them to the City as they occur.  Three examples of such chronic overflows are described in fact sheets prepared by Blue Water Baltimore (attached as Exhibit E):

    a.  The Herring Run overflow described above has continued to be a chronic overflow.  For instance, heavy rainfall on April 30, 2014, caused a number of overflows, which Blue Water Baltimore reported to the City.  However, the City only addressed one of the overflow locations.

    b.  The Jones Falls area described above has also remained a chronic overflow location, with Blue Water Baltimore documenting seven separate overflow events between August 12, 2014 and April 7, 2016.

    c.  A recent example of an overflow to which the City's response has been inadequate took place at Wyman Park.  On June 6, 2016, a substantial overflow occurred at that location, which Blue Water Baltimore reported to the City.  The City did not cordon off the area or remove any wastewater debris until at least three days after the overflow event.

40.     Another recent example of an overflow to which the City's response has been inadequate relates to the Chinquapin Run stream.  An overflow has been ongoing at that location since at least March 30, 2016, through at least July 11, 2016.  The City did not provide prompt public notification, nor has it eliminated the overflow.  Blue Water Baltimore provided a letter to Plaintiffs documenting these concerns on July 11, 2016, and requested that they take action to address the issue.  (Attached as Exhibit F).

41.     All of these overflows are violations of the Clean Water Act.  The Clean Water Act prohibits the "discharge of pollutants" except in compliance with the Act, including having a valid National Pollutant Discharge Elimination System (NPDES) permit. 33 U.S.C. § 1311(a). "Pollutant" is expressly defined as including "sewage."  33 U.S.C. § 1362(6).  The sewage from these discharges reaches various waters of the United States and such discharge of sewage without a NPDES permit is a violation of the Clean Water Act, as is alleged in the United States's complaint in this action, ¶¶ 42-44.

### C.     The Proposed Modified Consent Decree.

42.     The original Consent Decree approved by this Court contemplated completion of all remedial actions by January 1, 2016.  Consent Decree ¶ 9.A; *see also* App'x D (providing for elimination of all sanitary sewage overflow structures by June 30, 2008); EPA Press Release (June 1, 2016) ("The original Consent Decree required all work to be completed by January 2016 . . . .").[3]  The City did not meet this deadline.  Indeed, it has not completed 23 required rehabilitation projects throughout the City, including outstanding pipe repairs and replacements in the Herring Run, Jones Falls, Gwynns Falls, Dundalk, and Patapsco sewersheds.

---

[3] *Available at* https://www.epa.gov/newsreleases/us-maryland-amend-agreement-baltimore-city-curtail-sewer-overflows-and-improve-water

43.     Instead of meeting the deadlines in the original Consent Decree, or coming into full compliance with the Clean Water Act, the City negotiated with Plaintiffs for a modification to the Consent Decree, which would extend the deadline to come into compliance with the Clean Water Act to December 31, 2030 – and potentially to 2033 or later, if violations are found after 2030.  Proposed Modified Consent Decree ¶¶ 8.b.iii, 9.b.i, e.ii; *see also* EPA Press Release (June 1, 2016) (noting that the City is to conduct monitoring for two years after December 31, 2030, and if such monitoring indicates that "the rehabilitation did not sufficiently eliminate the overflows," further corrective work by the City may be required).

44.     In the interim 14 to 17 years, the City will continue to unlawfully discharge untreated sewage – pollutants which present a risk to the public health and the environment.  Indeed, even after the first five years of implementation of the proposed Modified Consent Decree are complete, EPA itself estimates that the City will continue to discharge 17% of the current volume of unlawful wet-weather sewage overflows.  Plaintiffs have provided no justification for allowing these discharges, which violate the Clean Water Act, to continue beyond the deadline in the current Consent Decree, much less for another 14 to 17 years.

45.     Moreover, wet-weather sewage overflows are only one type of overflow.  Studies indicate that dry-weather overflows in fact discharge a larger volume of wastewater than wet-weather overflows.  There are also sewage discharge of unknown origin overflow events and wastewater treatment bypass overflow events.  Neither Plaintiffs nor the City have publicity indicated the extent to which the actions proposed in the Modified Consent Decree will control these other types of untreated sewage discharges, or the date by which these overflows will be eliminated.

## VIII.   CAUSES OF ACTION

### COUNT I

### Violation of the 2002 Consent Decree

46.     Paragraphs 1 through 45 are incorporated herein by reference.   In addition, paragraphs 1 through 49 of the original complaint in this action, filed on April 26, 2002, are re-alleged and incorporated herein by reference.

47.     Through the acts and omissions described herein, the City of Baltimore has violated and will continue to violate the terms of the 2002 Consent Decree.

48.     The Consent Decree makes plain that "Baltimore shall remain solely responsible for any non-compliance with the terms of this Consent Decree, all applicable permits, the Clean Water Act, and regulations promulgated under that Act."   Consent Decree ¶ 50.

### COUNT II

### Violation of the Clean Water Act & Implementing Regulations

49.     Paragraphs 1 through 48 are incorporated herein by reference.   In addition, paragraphs 1 through 49 of the original complaint in this action, filed on April 26, 2002, are re-alleged and incorporated herein by reference.

50.     Through the acts and omissions described herein, the City of Baltimore has violated and will continue to violate the Clean Water Act, 33 U.S.C. §§ 1311, 1319, 1342, and its implementing regulations.

## COUNT III

### Approvability of the Proposed Modifications to the Consent Decree

51.    Paragraphs 1 through 50 are incorporated herein by reference.   In addition, paragraphs 1 through 49 of the original complaint in this action, filed on April 26, 2002, are re-alleged and incorporated herein by reference.

52.    The parties seeking modification of the current Consent Decree "bear the burden of establishing that a significant change in circumstances warrants revision of the decree," and demonstrating that "the proposed modification is suitably tailored to the changed circumstance." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 383 (1992).   A party cannot seek modification simply because "it is no longer convenient to live with the terms of a Consent Decree." *Rufo*, 502 U.S. at 383.

53.    The Plaintiffs and Defendant have not shown any persuasive change of circumstances since 2002 that would warrant allowing violations of the Clean Water Act to continue until 2031 (or later) and to be sanctioned by this Court by approving the Modified Consent Decree.  Even if such a change of circumstances existed, the Plaintiffs and Defendant have not shown that "the proposed modification is tailored to resolve the problems created by the change in circumstances," and does not, for example, extend the timeline more than absolutely necessary due to the change in circumstances.  *Rufo*, 502 U.S. at 394.

54.     The effects of a decree on third parties and the public interest should be taken into account when determining whether or not approval of a Consent Decree modification is warranted.  As the Supreme Court has explained, "a court should surely keep the public interest in mind in ruling on a request to modify based on a change in conditions." *Rufo*, 502 U.S. at 392; *see also, e.g.*, *Juan F. ex rel. Lynch v. Weicker*, 37 F.3d 874, 879 (2d Cir. 1994) (noting that

the purpose of the modification standard set forth in *Rufo* is to ensure "that the public interest can be preserved"); *United States v. S. Florida Water Mgmt. Dist.*, No. 88-1886, 2010 WL 6268442, at *32 (S.D. Fla. Aug. 30, 2010) (noting that modification of a Consent Decree can be appropriate if all parties agree, "as long as the modification does not disserve the public interest or compromise the Court's responsibility to enforce its decree").

55.     As explained above, the 2002 Consent Decree required compliance by January 1, 2016.  Instead of holding the City to its bargain, the proposed modification to the Consent Decree will allow unlawful sewage discharges and the resulting adverse impact to the public and the environment to continue until the year 2031 – and potentially until 2033.  The Modified Consent Decree does not contain adequate provisions to protect the public and the environment from unlawful discharges of sewage while the projects required by the Modified Consent Decree are being implemented.

56.     The Plaintiffs and Defendant have not, moreover, shown that the projects required by the Modified Consent Decree will in fact result in compliance with the Clean Water Act.  The proposed Modified Consent Decree does not contain a commitment to eliminate all unlawful discharges.   It also does not contain a commitment to route all sewage to the City's treatment plant and to comply with NPDES permit requirements for all discharges of wastewater.

## IX.     RELIEF REQUESTED

WHEREFORE, Plaintiff-Intervenor Blue Water Baltimore respectfully prays that this Court provide the following relief:

1.     A declaration that the City of Baltimore is in violation of the Clean Water Act and the 2002 Consent Decree;

2.      A declaration that the proposed amendments to the Consent Decree cannot be approved as submitted without changes to protect the public and the environment and to assure full compliance with the Clean Water Act as soon as possible;

3.      A modification of the 2002 Consent Decree to address the lack of compliance and enforcement of the City of Baltimore's obligations;

4.      An injunction against the City of Baltimore compelling compliance with the Clean Water Act and the 2002 Consent Decree;

5.      An order enforcing the Clean Water Act and imposing civil penalties against the City of Baltimore pursuant to 33 U.S.C. §§ 1319, 1365;

6.      An award of attorney's fees and reasonable litigation expenses incurred in this case; and

7.      Such other relief as this Court may deem appropriate.

Respectfully submitted,

Dated:  July 27, 2016.      /s/ Patrick M. Phelan
                              Theodore L. Garrett, *pro hac vice*
                              Thomas R. Brugato, *pro hac vice*
                              Patrick M. Phelan, Federal Bar No. 29283

                              Covington & Burling LLP
                              One CityCenter
                              850 Tenth St., NW
                              Washington, DC 20001
                              Phone: (202) 662-6000
                              Fax: (202) 778-5107
                              Email: pphelan@cov.com

                              *Counsel for Blue Water Baltimore*

16

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on July 27, 2016, I electronically filed the foregoing with the Clerk of the United States District Court for the District of Maryland using the CM/ECF system, which will provide notice to all counsel of record registered on the CM/ECF system in this case.

Dated: July 27, 2016

/s/ Patrick M. Phelan_____
Patrick M. Phelan, Federal Bar No. 29283

Covington & Burling LLP
One CityCenter
850 Tenth St., NW
Washington, DC 20001
Phone: (202) 662-6000
Fax: (202) 778-5107
Email: pphelan@cov.com

*Counsel for Blue Water Baltimore*

Exhibit A

## DECLARATION OF HALLE VAN DER GAAG

I, Letitia Hadley Van der Gaag (a/k/a Halle Van der Gaag), declare as follows:

1. I am more than eighteen years old and am competent to testify. This Declaration is based on my personal knowledge and belief.

2. I am the Executive Director of Blue Water Baltimore ("BWB") the proposed plaintiff-intervenor in *United States v. Mayor & City Council of Baltimore*, No. 02-01524 (filed Apr. 26, 2002). I have been the Executive Director of BWB since 2011. As Executive Director, I am responsible for supervising all employees of BWB and providing overall direction for its mission, programmatic, and administrative functions.

3. BWB is a nonprofit corporation organized under the laws of the State of Maryland and is a charitable corporation under section 501(c)(3) of the Internal Revenue Code. BWB maintains its offices at 3545 Belair Road, Baltimore, Maryland 21213.

4. BWB was formed in 2010 through the merger of five watershed organizations: the Gwynns Falls Watershed Association, the Jones Falls Watershed Association, the Herring Run Watershed Association, the Baltimore Harbor Watershed Association, and the Baltimore Harbor WATERKEEPER.

5. The mission of BWB is to restore the quality of Baltimore's rivers, streams, and Harbor to foster a healthy environment, a strong economy, and thriving communities. The interests we seek to advance through intervention in this litigation fall squarely within this mission.

6. BWB engages in a number of activities to accomplish its mission. For instance, BWB mobilizes volunteers to monitor pollution in their local streams, organizes community trash cleanups and tree plantings, and provides a helping hand to property owners who want to do their part to reduce polluted stormwater runoff from their properties. BWB advocates for stronger laws for clean water, both locally and on a state and regional level. BWB runs the Herring Run Nursery, which sells native plants and provides landscaping and design services to community members, thus increasing our tree coverage in Baltimore and decreasing the amount of stormwater runoff reaching waterways. BWB is the home for the Baltimore Harbor WATERKEEPER, who patrols Baltimore's streams and Harbor, responds to citizen pollution reports received on its pollution reporting hotline, and holds polluters and government accountable under the law.

7.  BWB is a membership organization. Certain of BWB's members are the members of the BWB Board of Directors, who have voting rights.  At present, BWB has 23 board members.

8.  The remainder of BWB's members consists of individuals who donate to the organization.  At present, BWB has over 600 supporting members.  BWB supports these members by advocating on behalf of their interests in local and regional forums, including legislative bodies, government agencies, and courts, and by keeping them informed about environmental issues that impact their communities in Baltimore, as well as communities around the Chesapeake Bay region.

9.  BWB members have suffered, and continue to suffer, injury to their interests due to the contamination of Baltimore's waterways by the Baltimore City sewage system.  Such injuries include, but are not limited to, diminishment of members' use and enjoyment of waterways for commercial, residential, recreational, conservation, and aesthetic purposes. I have gained my understanding of these injuries through a number of sources, including through communications directly with the members.

10. Sewage not only discharges directly to Baltimore's waterways from the sewage infrastructure in Baltimore, but also untreated through the City's stormwater infrastructure.  Sewage pollution contributes several types of pollutants to Baltimore's waterways such as nutrients, fecal bacteria, and even toxic metals.  It is a threat to the health of Baltimore's waterways, its citizens, and its economy.

11. Because of its immense impact on the water quality and health of the communities in Baltimore, addressing illegal sewage pollution from Baltimore City's sewage infrastructure is a priority issue for BWB.  Between just 2014 and 2015, Baltimore City reported at least 1,023 incidents of sewer overflows, providing overflow volume estimates for only 406 of those incidents. As a result, Baltimore City estimated discharging over 10.6 million gallons of raw sewage into Baltimore's streams and Harbor for 406 of the reported sewer overflows incidents.  This amount does not include the amount of sewage discharging into the streams from the other 617 reported sewer overflows; the continuous and intermittent discharges from sewage-contaminated stormwater outfalls; or the volume of sewage that discharges from the 13 known sewage overflow structures (which discharge millions of gallons more every year).  Nor does it include sewage overflows that went entirely undetected by the City.

12. BWB, its five legacy organizations, and its volunteers have advocated on the sewage issue in Baltimore for over a decade.  Much of this advocacy has been specific to the consent decree that resulted from the Environmental Protection Agency ("EPA") and Maryland Department of the Environment ("MDE") bringing an enforcement action

against Baltimore City in 2002 for its illegal sewage discharges into Baltimore's waterways ("2002 Consent Decree").  This advocacy has included communications and meetings with the City, MDE, and the EPA regarding the major issues we see with the 2002 consent decree terms and the lack of compliance with those terms.

13. The board of BWB voted to approve intervention in this matter because of the direct link between elimination of sewage pollution and furthering BWB's mission.


    I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.


Executed on this __8__ day of July, 2016.

                                      Halle Van der Gaag

Exhibit B

## DECLARATION OF DEBRA LENIK

I, Debra Lenik, declare as follows:

1. I am more than eighteen years old and am competent to testify in this matter. This declaration is based on my personal knowledge and belief.

2. I am a volunteer and member of Blue Water Baltimore ("BWB"), and I was previously employed as a Volunteer Coordinator and Urban Forestry Manager for BWB from 2010 until 2015. As Volunteer Coordinator for BWB, I helped recruit and coordinate volunteers to monitor, detect, characterize and report pollution to our organization and government agencies. As part of my duties, I regularly assisted with pollution investigations and water quality monitoring studies and other fieldwork that involved working within and in close proximity to Baltimore's waterways. As Urban Forestry Manager, I regularly managed the planning, coordination and implementation of urban reforestation projects. Many of these projects, such as riparian buffer plantings, put me in close proximity to Baltimore's waterways.

3. I reside at 3133 Guilford Ave in Baltimore. My residence is located 3,300 feet from the Stony Run tributary of the Jones Falls.

4. I am the Production Director of the Baltimore Rock Opera Society and have been since 2015.

5. I hold a Bachelor's of Arts in Political Science and International Relations from Goucher College. I am also an arborist certified by the International Society of Arboriculture.

6. I make monetary donations to BWB regularly and have been a member of BWB since 2012. I joined BWB because I share its commitment to restoring the water quality of Baltimore's waterways, including the Patapsco and Back Rivers and their non-tidal segments.

7. Clean water in the Patapsco and Back Rivers is especially important to me because I regularly use and enjoy the Rivers. I regularly hike alongside the Stony Run, Jones Falls mainstem, and other Baltimore-area waterways, and I periodically bike along the Jones Falls and the Harbor. I am a longtime volunteer for the American Visionary Art Museum's Kinetic Sculpture Race every May, of which a section of the race route goes into the water at Canton Waterfront Park. I enjoy paddling and stream cleanups as a volunteer.

8. As a former employee and volunteer for BWB, I understand how sewage pollution, which contains human pathogens, nutrients, toxics and other pollutants, can impact waterways, by causing algae blooms that lower the oxygen levels in the water, contribute to fish kills, and otherwise adversely impact the ecosystems found in Baltimore's waterways. I also worry that the illegal sewage discharges from City of Baltimore's sanitary sewer system pose a threat to the health of me, my friends and family, and all of

the residents and visitors to the City. Given these discharges, I have stopped using the Jones Falls trail for biking during severe storms when I can clearly see sewage debris, and have entirely stopped paddling in the Inner Harbor.

9. I first observed sewage pollution in Baltimore as an employee of Blue Water Baltimore in the spring of 2010, when I saw a sewer stack overflowing into the Herring Run. I was performing a site visit for a volunteer trash cleanup in the park and noticed a sewage odor. Following the trail further towards the river, I noticed that some bricks had come loose from one of the sewer stacks that are located directly along the Herring Run and the stack was freely discharging into the stream. Upon reporting the incident to the City's 311 hotline I had difficulty explaining to the operator where the incident had occurred because there wasn't a street intersection nearby that I could provide. I eventually received a call back from the Department of Public Works ("DPW") and I met a DPW employee along Belair Road, who I escorted back to the stack, which was still overflowing. The employee did not seem concerned or in a hurry to address the issue and I was surprised, since the flow rate was significant.

10. I saw the same stack overflowing in 2013 and reported the overflow to the Blue Water Baltimore staff.  I reported the incident online.  When I followed up at the site the next day, I saw a DPW truck parked on the trail next to the river with an employee sleeping in the driver's seat and no action being taken. The sewer stack was still overflowing into the river.

11. In the spring of 2012 I was with a volunteer group performing a trash cleanup at a section of the Gwynns Falls near the Carroll Park Golf Course. As I was walking upstream to scout out more areas to send volunteers, I noticed suds were clearly entering the Gwynns Falls from a smaller tributary and immediately went back and told the volunteers that there had been a sewage overflow upstream and the water was not safe to enter or touch, even with our work gloves. Everyone had to work entirely on the bank for the rest of the project and we reminded the volunteers to shower and wash their clothes and gear when they returned home, but the contact and exposure to the polluted water had already happened.

12. In 2013 my mother joined me as a volunteer for the Kinetic Sculpture Race described above. We volunteered as "Kinetic Kops" at Canton Waterfront Park, which means monitoring and sometimes towing the sculptures from kayak or canoe while they go through the water portion of the race route. We launched our kayaks from Canton Waterfront Park, and our feet got wet—most sculpture pilots and Kinetic Kops at the waterfront experience direct contact with the water. Two days later, my mother contracted a Staph infection on her leg, where she had an open cut. I believe this was a result of fecal bacteria in the water due to frequent sanitary sewer overflows directly into the Harbor, which is well known to be a possible cause of Staph infections.

13. The continued discharges of untreated sewage to Baltimore's waterways have impaired and continue to impair my aesthetic and recreational use and enjoyment of the Patapsco and Back Rivers and their tributaries.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this __12th__ day of July, 2016

Debra Lenik

Exhibit C

## Declaration of Guy Tilghman Hollyday

I, Guy Tilghman Hollyday, declare as follows:

1. I am more than eighteen years old, am competent to testify, and have personal knowledge of the matters stated in this declaration.

2. I am a member of Blue Water Baltimore ("BWB") and have been a member since 2011.

3. I live at 719 Field Street, Baltimore, Maryland, 21211 with my wife Pam. I have lived at this location since 1982.

4. In the more than fifty years of my work history, I served in the U.S. Army; worked as an inspector for Baltimore City Health Department; obtained a PhD from Johns Hopkins University and taught at three academic institutions; worked in publishing; pursued graduate study, obtained licensing and worked for years as an acupuncturist; and have studied and published on the history of Baltimore's neighborhoods.

5. In the late 1990s I acted as volunteer head of water quality testing for the Jones Falls Watershed Association, an activity that I continued after the 2002 signing of the Consent Decree and until the Watershed Association merged with other groups to form Blue Water Baltimore in 2010.

6. Until my retirement in 2014, I worked at the Penn North Neighborhood Center in West Baltimore.

7. I live about a quarter of a mile from Stony Run, a tributary of the Jones Falls. I grew up on a farm with streams that my Dad and I used to care for. When I first came to this neighborhood in 1982, I began at once to care for Stony Run and the public path along its lower reaches. This meant removing trash from the stream, such as old tires, shopping carts, discarded clothing, broken furniture, plastic swimming pools, broken hot-water heaters, food, etc.

8. I found that the sewage spewing out of the sanitary manhole stacks during rainstorms was worse than the trash in the stream. Worst of all was an on-going sewage flow from a polluted storm drain at Stony Run. I saw kids swimming right below it. Further downstream I used to see kids and even parents with their kids playing in the water. I would warn them of the contamination, but they didn't seem to pay attention.

9. When I learned that untreated or raw sewage was flowing into waterways all over Baltimore City both in dry weather and in rainstorms, I was so alarmed that in the year

2000 I organized a citizens' group, the Baltimore Sewer Coalition, to combat sewage in our streams. I also joined the Jones Falls Watershed Association.   When I use the term "sewage" in this declaration, I mean raw, untreated sewage.

10. From 2000 until 2010, I weekly or biweekly tested Baltimore's streams at ten sites for sewage pollution using a spectrophotometer on loan from the Department of Public Works ("DPW"), which trained me in its use. Later, another trained person, Will Dixon, used the spectrophotometer, and I used colorimeters to measure Ammonia and other indicators of sewage contamination. We have kept track of our findings and turned them over to the then-Surface Water Management Division of the DPW. I have also continued testing the Stony Run intermittently since 2010 to present-date.

11. In 2003, a tree-trunk in Herring Run during a storm knocked off a sanitary sewer stack and more than a million gallons of sewage flowed into the stream. I went there and observed the raw sewage flowing into the stream.

12. In southwest Baltimore, Gwynns Run, a tributary of the Gwynns Falls, was heavily polluted all the time with visible sewage, not just during storms, and kids were swimming where it flowed into the Falls. Between 2000 and 2010, I determined that the stream, which discharged from a stormwater outfall, was polluted with sewage by testing for Ammonia using a spectrophotometer and colorimeter. Based upon publicly-available water-quality reports, the Gwynns Falls and Gwynns Run are still polluted with sewage, probably as much as they were in the past.

13. The effectiveness of the Consent Decree, like any such decree, depends on implementation and enforcement. Prior to the signing of the Decree in 2002, there were five ongoing sources of sewage flowing into Baltimore's streams. These sources included locations on the Stony Run where I often walked for recreation and where I observed youth swimming in the water regularly. In the annual reports of the Sewer Coalition which I wrote, we informed the DPW of the location of these sewage-contaminated flows, one of which was judged to be discharging 200 gallons a minute over the course of approximately 15 years. This discharge continued until 2010 when I believe that the DPW finally fixed the source of the sewage. The DPW failed to look for sources of the other sewage discharges, stating that it would pay attention only to its investigation of sewage in the smaller pipes, and this would fix the bigger flows. That was twelve years ago. To my knowledge, despite our annual reports to the DPW and despite reports to the EPA, contamination continues at most of these places, including the Stony Run, Gwynns Falls and Western Run.

14. In 2003 I authored a report on sewage from the city. The DPW responded and pointed out some errors in my estimation of sewage discharge flows in the report. We corrected the errors the next year and wrote reports each year from 2004 to 2007 documenting ongoing sewage discharges that were not being addressed by DPW. DPW failed to respond to our reports. What we revealed about the ongoing sewage flows could not be refuted.

15. The first annual report was titled "Sewage in Baltimore: Report for the year 2003," and dated August, 2004. The report began by pointing out that there were sewage flows into Baltimore's streams both in dry and wet weather and noted the hazard this constituted for kids who wade and swim in the water and for persons who eat contaminated fish. It then pointed out the unreliability of the DPW's reports required by the Decree: some city overflows were recorded as occurring in a neighboring county; addressees were often vague (a "hundred block" rather than a house number, making it difficult to know whether an overflow was new or old); some addresses were incorrect; streams were linked to the wrong watershed. Finally, after we corrected our estimates for flows, we tested the DPW overflow amounts in a few cases and found them to be uniformly underestimated. Some sites had to be visited more than once within a short time, suggesting inadequate repair the first time. One bypass operation lasted nine months. The DPW explained that the repair was difficult. The report for 2003 also noted that the overflow near the Baltimore Streetcar Museum had been reported, that dye testing was done, and that no corrective action was taken. This is an outfall that is still polluted with sewage in 2016.

16. Referring to the flow of pollution from storm-drains in dry weather as well as wet, the Executive Summary of the 2005 report asked, "At what point does a constant flow of pollution into streams and the Baltimore Harbor constitute an emergency that must be addressed?"  At present, at least two of the sources of sewage discharge that we first reported prior to 2002, the one by the Baltimore Streetcar Museum and the Gwynns Falls tributary, Gwynns Run, are still contaminated. The other problems described in the report were the unbelievable flow durations reported by the DPW, the danger posed by trees floating down the streams in storms, the rapidity with which some repairs are deteriorating, and the failure of the DPW to abide by the Consent Decree agreement and report sewage volume from the time it first received the report.

17. The report for 2006 stated that inspectors for the coalition continued to find previously undiscovered sewage flows into the City's waters, and stated "Even after all the sewer lines have been rehabilitated by 2016, vigilance will be required to detect sewage entering into the city's storm drainage system." It stated further, "At the end of 2006,

there were five known locations where sewage flows into city streams. . . . the flow near the Baltimore Streetcar Museum . . . should be addressed immediately." And once again the report called on the DPW to observe the Consent Decree requirement to report sewage flows from the time they were first reported not from the time the Department begins to repair them. The report then lists the known on-going sewage flows from storm drains: Kresson Street, by the Streetcar Museum, Gwynns Run, and Stony Run and Cold spring Lane at Greenspring Avenue.

18. The report for 2007 echoed many of the previous findings. One key sentence was the following: "The Department has failed to report a portion of the known time of sewage flows, and some overflows have not been reported, as required by the Consent Decree. . . .  In its report on the year 2004 the BSC ("Baltimore Sewer Coalition") listed seventeen unreported overflows that apparently should have been reported. This report lists thirty more [four of which were referred for action]."  And again ongoing sewage discharges were noted in Stony Run, Gwynns Run, Kresson Street/Linwood Avenue, adjacent to the Baltimore Streetcar Museum, and Cold Spring Lane/Greenspring Avenue

19. From my own investigations and reviews of the City's reports, I have found that the City's DPW consistently defies the Consent Decree, and I am concerned about the City's violations of the Consent Decree, including as recently as the City's public reporting and cleanup violations earlier this year for a sewer leak on the Chinquapin Run, which continues to discharge because the leak has not been fixed by the City. In particular, I have observed that the City ignores and otherwise does not accurately report many sewer overflows, which is a reporting violation of the Consent Decree, and that the City does not account for the sewage flow that occurs between the time an overflow is reported by a citizen to the City and when the City repairs or otherwise ceases the overflow.  Significant amounts of sewage can be discharged by even a so-called "minor" overflow if the City delays in correcting the problem.

20. To my knowledge, two ongoing and continuous sewer overflows have never been corrected by the City. One of these two, located near the Streetcar Museum on the Falls Road, has a flow estimated by a DPW employee at 200 gallons per minute, which constitutes 300,000 gallons of sewage headed for the Inner Harbor and the Chesapeake every day for the fourteen years the Consent Decree has been in effect. The other continuous sewer overflow is the Gwynns Run. I do not live far from the Streetcar Museum outfall on the Jones Falls and walk along the Jones Falls for recreation.

21. When we asked that this sewer overflow be corrected in 2003, the Department answered that their inspections of all the smaller pipes in the City would reveal the

source. But the Department does not report to the public its progress and the sewage overflow to the Harbor and the Chesapeake apparently continues unabated.

22. I often walk on the trails that adjoin the Stony Run and Jones Falls for exercise and recreation, and plan to continue to do so in the future.

23. Unfortunately, the persistent sewage contamination and overflows in the Stony Run and Jones Falls, including continuous discharges from the outfall location at the Streetcar Museum and the adjacent sewer relief pipe OF67, which discharged at least 15,000 gallons of sewage as recently as June 21, 2016, and in particular the discoloration, smell and knowledge of the adverse health and environmental impact of these overflows, interferes with my ability to enjoy these excursions.

24. My chief concern, however, is for the health of persons who wade and play in the water contaminated by sewage discharged by the city. I can only imagine what disease this causes.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this _____ day of July, 2016.

Guy Tilghman Hollyday

Exhibit D



February 28, 2013

*Via First Class and Electronic Mail*
Shawn M. Garvin
Administrator, Region 3
Environmental Protection Agency
1650 Arch Street
Mail Code 3RA00
Philadelphia, PA 19103-2029
Garvin.shawn@epa.gov

Re:  Sewage Consent Decree for Baltimore City

Dear Mr. Garvin,

We write to you to request your immediate attention to the ongoing and egregious sewage contamination of Baltimore's streams and Harbor.  As you know, over ten years ago, EPA and the Maryland Department of the Environment ("MDE") filed an enforcement action against and subsequently entered into a consent decree with Baltimore City related to sewage discharges from its wastewater system ("Consent Decree").  Since that time, Blue Water Baltimore and its legacy organizations have been following this issue closely and communicating with the City, MDE, and EPA regarding its concerns with the scope of the consent decree as well as Baltimore City's compliance with its current requirements.[1]

Through the merger of five watershed organizations in 2010, Blue Water Baltimore ("BWB") has become one of the region's largest water quality advocacy and restoration organizations and is comprised of scientific and legal professionals utilizing tools ranging from grassroots organizing in Baltimore's underserved neighborhoods, to water quality monitoring, legal advocacy and enforcement.  The Baltimore Harbor Waterkeeper program of BWB utilizes sound science and environmental laws towards the goal of abating water pollution and ensuring environmental compliance in our watershed.  This advocacy focuses on several water pollution issues including that from trash, toxics, stormwater, and sewage.  In order to further its mission of cleaning up Baltimore's waterways, BWB has successfully raised millions of dollars for restoration projects in the Baltimore metro region and utilizes legal action when necessary.

---

[1] *See e.g.* letter from Baltimore Sewer Coalition to Baltimore's Mayor in 2008, as Attachment A to this letter; February, 2010 Baltimore Sewer Coalition meeting agenda as Attachment B; and April, 2010 Baltimore Sewer Coalition meeting agenda and minutes as Attachment C.

Pollution from untreated sewage discharges into Baltimore's waterways is not just an environmental issue, but a public health and economic issue as well.  BWB staff has responded to, collected water quality samples from, and otherwise documented numerous sewage overflows and incidents in the City—many of which were visibly originating from the wastewater system and others which were discharging from the stormwater system into our waterways.  These are the same waterways in which the citizens of Baltimore and their children recreate and even fish and crab for subsistence reasons.  These are also the same waterways that provide the heart of the economic engine of our City, and attract thousands of tourists to our State.

Along with this letter, we have enclosed documentation of several examples of the above-referenced sewage overflows and other sewage incidents that BWB has responded to, and that have caused us major concern.  Specifically, our concerns with these incidents are related to extensive water quality contamination; lack of public notification of sewage incidents and their associated public health threats; interim "fixes" of certain sanitary sewer overflows that provide an immediate threat to water quality; and lack of reporting of the existence and extent of certain sanitary sewer overflows to MDE and EPA.  We previously reported and provided documentation of every one of these incidents to EPA, MDE and/or the City, but wanted to include them in one complete package for you at this time.

***After many years of advocating at various levels on this issue, we are now asking EPA to help BWB, the City, and the State to address this problem by doing the following as soon as possible:***

1.  Review and analyze the enclosed documentation of serious examples of where the City's compliance with the Consent Decree, and sometimes the scope of the Consent Decree itself, fall short.[2]  These examples by no means represent an exhaustive list of sewage issues in the City, but provide a good sampling of egregious incidents responded to by BWB;

2.  Increase its oversight and enforcement of the Consent Decree, including conducting a formal investigation of the City's compliance with the Consent Decree.  This compliance audit should focus on the City's compliance with its reporting obligations, notifications to the public, and completion of construction projects and deadlines.  We specifically request that EPA follow up on the incidents referenced in the enclosed documentation as a starting point to its audit; and

---

[2] *See* detailed Table of Contents and the enclosed documentation immediately following this letter.  Specifically, Appendices I – VI provide documentation of six recent examples of sewage incidents in Baltimore City.

3.  Work with BWB, MDE, and the City to address the limited scope of the Consent Decree, including its failure to adequately address Sewage Discharges of Unknown Origin ("SDUOs") from the stormwater system ("municipal separate storm sewer system" or "MS4").  These sewage discharges from the MS4 constitute illicit discharges that should be regulated by the City's MS4 permit, and we believe strengthening the terms of that permit can help close this gaping hole in the purview of the Consent Decree.  Specifically the Illicit Discharge Detection and Elimination ("IDDE") section of the MS4 Permit should require that the City create a plan with enforceable interim benchmarks and deadlines for conducting a comprehensive source investigation and then eliminating each known SDUO, beginning with the known "Filthy Five" hot spot outfalls.  Alternatively, the MS4 Permit should explicitly require the City to incorporate this IDDE/ SDUO investigation and elimination plan into the applicable Total Maximum Daily Load ("TMDL") implementation plans already required in the permit.[3]

We believe that the above requests are not only reasonable, but imperative to addressing the extensive sewage pollution in Baltimore.  Further, they are critical to protecting public health and meeting both Bay and local TMDL load allocations.

We look forward to discussing these issues further with you in the near future and specifically to your response to the above requests.  We thank you in advance for your commitment to clean and healthy waterways in Baltimore and the broader Chesapeake Bay watershed.

Sincerely,

Christine ("Tina") M. Meyers, Esq.
Baltimore Harbor Waterkeeper
Blue Water Baltimore
3545 Belair Road
Baltimore, MD  21213
tmeyers@bluewaterbaltimore.org
410-254-1577, x112

---

[3] *See* BWB's January, 2013 report providing necessary action items to address the SDUO issue in Baltimore City, as Attachment D to this letter.  Incorporating an enforceable IDDE/ SDUO plan requirement into the MS4 permit will address the six necessary action items referenced in detail in Attachment D, including an enforceable timeline for the comprehensive study and abatement of known SDUOs, and allocation of a significant portion of stormwater utility funds towards SDUO elimination.  *See also* BWB's comments on the Baltimore City MS4 permit submitted to MDE in September, 2012, as Attachment E.

Cc:     Jon Capacasa, Director, Water Protection Division, EPA Region 3;
David McGuigan, Associate Director, Water Protection Division, EPA Region 3;
Michelle Price-Fay, NPDES Enforcement Branch Chief, EPA Region 3;
Evelyn MacKnight, NPDES Permitting Branch Chief, EPA Region 3;
Nina Rivera, Assistant Regional Counsel, EPA Region 3;
Allison Graham, NPDES Enforcement, EPA Region 3;

Jeff Corbin, EPA Senior Advisor for Chesapeake Bay and Anacostia River;
Nicholas DiPasquale, Director EPA Chesapeake Bay Program;

Dr. Robert Summers, Secretary of the Environment, MDE;
Jay Sakai, Director, Water Management Administration, MDE;
Thomas Boone, Director, Compliance Program, MDE;
Carol Coates, Division Chief, Enforcement Division, MDE;
Brian Clevenger, Sediment, Stormwater & Dam Safety Program Manager, MDE; and

Steven R. Johnson, MDE Principal Counsel, Office of the Attorney General.



# TABLE OF CONTENTS

Attachments and Appendices to February 28, 2013 Letter to Administrator Garvin

Documentation of Sewage Events and Advocacy

| ATTACHMENT # | NAME | DESCRIPTION |
|---|---|---|
| A | February, 2008 Baltimore Sewer Coalition Letter to the City | Letter from Baltimore Sewer Coalition (comprised of BWB's five legacy organizations) to Baltimore's Mayor in 2008 regarding compliance with the sewage consent decree. |
| B | February, 2010 Baltimore Sewer Coalition Meeting Agenda | Agenda from BSC meeting with the City, MDE and EPA regarding compliance with the sewage consent decree. |
| C | April, 2010 Baltimore Sewer Coalition Meeting Agenda and Minutes | Agenda and minutes from BSC meeting with the City, MDE and EPA regarding compliance with the sewage consent decree. |
| D | January, 2013  BWB Report re: Action Items to Address SDUOs in Baltimore | BWB report detailing six necessary action items to address the Sanitary Discharge of Unknown Origin (SDUO) issue in Baltimore, including the "Filthy Five" outfalls.  Includes attachments to report. |
| E | September, 2012 BWB MS4 Comments | Extensive legal and technical comments submitted by BWB to MDE re: Baltimore City draft MS4 permit. Includes select attachments to comments. |

| APPENDIX # | NAME | DESCRIPTION |
|---|---|---|
| I | Sewage Concern 1:  Falls Road/ Street Car/ Hurricane Sandy | Fact Sheet regarding and documentation of chronic sanitary sewer overflows and associated public health threats on Falls Road, along the Jones Falls near the Street Car Museum.  Includes photo documentation. |
| II | Sewage Concern 2: Sewage Bypass OF 67 | Fact sheet regarding and documentation of sewage overflow bypass mechanism discharging into the Jones Falls near the Street Car Museum.  Includes photo and video documentation and water quality monitoring data.  (Video on CD and in e-link only). |
| III | Sewage Concern 3:  Jones Falls pumping station | Fact sheet regarding and documentation of overflow mechanism at the Jones Falls pumping station.  Includes photo documentation. |



| APPENDIX # | NAME | DESCRIPTION |
|:---:|---|---|
| **IV** | Sewage Concern 4:  June, 2012 sewage incident in Baltimore Harbor | Information regarding and documentation of widespread sewage incident in the Baltimore Harbor in June, 2012.  Includes photo documentation and water quality monitoring data and analysis, as well as a BWB memorandum sent to the City detailing its response to the incident and its concerns with agency response. |
| **V** | Sewage Concern 5:  Herring Run Sewage Stack | Fact sheet regarding and documentation of chronic sanitary sewer overflows from a sewage stack in the Herring Run.  Includes photo and video documentation and agency correspondence regarding concerns with underreporting of the incident.  (Video on CD and in e-link only). |
| **VI** | Sewage Concern 6:  South Clinton Street | Fact sheet regarding and documentation of chronic sanitary sewer overflows at 1800 S. Clinton Street.  Includes photo documentation. |

Exhibit E



**Baltimore Harbor Waterkeeper Fact Sheet**
**SSOs in the Hall Springs area of Herring Run Park**
**June 23, 2016**

- The Hall Springs area of Herring Run Park is located near the intersection of Harford Road and Argonne Drive in Northeast Baltimore City.  This area is used extensively by Baltimore area residents for recreation including hiking, fishing, and biking.  There are several walking paths in the area, and the Herring Run Sewer Interceptor runs through the park as well.

- Blue Water Baltimore staff have observed and responded to various persistent and repeated Sanitary Sewer Overflows along the Herring Run Interceptor for several years, in the area between Harford Road and Belair Road.

- For example, heavy rainfall on April 30th, 2014 caused sanitary sewer overflows at several different points along the Herring Run Interceptor.  Blue Water Baltimore reported several of these SSO's to 311 (SR# 14-00314511; 14-00314522; 14-00314547), but it took seven days before DPW conducted an initial follow-up investigation.  Once DPW did respond, only one SSO location was addressed; the rest of the reports were closed without action.

- Over the course of several days, five separate SSO locations along the Herring Run Interceptor were identified by Blue Water Baltimore staff and photo documentation was provided to the City via 311 reports and direct emails to DPW employees.  Blue Water Baltimore staff found sewage bypass pumping equipment in the woods of the Hall Springs area, indicating that DPW was aware of these SSO's and the resulting wastewater debris throughout the area.  Despite this fact, no public notification was ever made about any SSO's in the Herring Run, and DPW failed to clear the area of wastewater debris.

- Below are photos taken at several locations along the Herring Run Interceptor that were subject to sanitary sewer overflows as a result of heavy rainfall on April 30th, 2014.

- See attached email communication from David Flores, Baltimore Harbor Waterkeeper, to Rudy Chow, Director of the Baltimore City Department of Public Works, in regards to the City's response to the sanitary sewer overflows along the Herring Run Interceptor on April 30, 2014.

- Video of this SSO event can be viewed at:  https://www.youtube.com/watch?v=JKcj14IDs0w .





A sanitary sewer manhole overflows with a mixture of sewage and stormwater on April 30, 2014.  This SSO is located along the trail in Herring Run Park and corresponds to SR# 14-00314522.





A sanitary sewer manhole overflows with a mixture of sewage and stormwater on April 30, 2014. This SSO is located in the Hall Springs area of Herring Run Park near the Harford Road bridge, and corresponds to SR# 14-00314547.





On May 8, 2014 the area around the sanitary sewer manhole corresponding to SR# 14-00314522 is covered with toilet paper, flushable wipes, and other wastewater debris.





On May 12, 2014, Blue Water Baltimore staff discovered sewage bypass pumping equipment at several sanitary sewer manholes in the woods of the Hall Springs area of Herring Run Park.  No public notifications of any kind were made in regards to sewage overflows into the Herring Run due to heavy rainfall on April 30th, 2014.





During a follow-up investigation on May 12, 2014, Blue Water Baltimore staff documented sewage bypassing equipment and widespread wastewater debris surrounding a sanitary sewer manhole in a field in Herring Run Park, approximate GPS coordinates (39.333052, -76.575412).  The area was littered with toilet paper and smelled strongly of sewage.



**Baltimore Harbor Waterkeeper Fact Sheet
SSOs at 2020 Falls Road, and the Jones Falls Trail
June 23, 2016**

- The stretch of road between 1800 – 2050 Falls Road is in a relatively low-lying area directly adjacent to the Jones Falls Stream, and approximately 0.1 miles north of the Baltimore Streetcar Museum.  The Jones Falls Trail, a pedestrian/ biking path, follows Falls Road in this area.  People commonly use this trail for recreation and for commuting to work by foot or by bicycle.

- The structured sanitary sewer overflow discharge point known as "OF67" is located within this stretch of road, at approximately 2020 Falls Road.

- Due to its relatively low elevation, this area is subject to chronic wet weather sanitary sewer overflows which discharge from both OF67 and through the street-level manholes along this stretch of road.

- Blue Water Baltimore staff have observed and responded to various persistent and repeated SSOs on Falls Road for several years, in the vicinity of 1800 – 2050 Falls Road, Baltimore, MD 21211.  Blue Water Baltimore has documented sanitary sewer overflows at this location on the following dates:

  - August 12, 2014
  - April 20, 2015
  - May 4, 2015
  - June 23, 2015
  - June 27, 2015
  - September 29, 2015
  - April 7, 2016

- Baltimore City DPW has consistently underestimated and underreported the volume of sewage discharged as a result of these SSO's.

- Below are photos taken along the Jones Falls Trail in the vicinity of 1800 – 2050 Falls Road, Baltimore, MD 21211.



**August 12, 2014**

On August 12, 2014 Baltimore experienced intense rainfall with most portions of the City receiving over 6 inches of accumulation in less than 12 hours.  The resulting stormwater flooded the sewer lines, causing widespread sanitary sewer overflows.  These overflows resulted in a massive discharge of stormwater and raw sewage to the Jones Falls stream and the Baltimore Harbor.

Following this significant rain event, Blue Water Baltimore staff observed a high volume of a mixture of raw sewage and stormwater flowing out of several sanitary sewer manholes in the road, along the public sidewalk, and directly into the adjacent Jones Falls stream at 2020 Falls Road, Baltimore MD 21211.  The area smelled strongly of sewage and was littered with wastewater debris.

On 8/15/2014 Baltimore City Department of Public Works reported that sanitary sewer overflows occurred at 1901 Falls Road, Baltimore MD 21211 as a result of this rain event.  DPW's estimate for the total volume of sewage lost as a result of these overflows was only 23,050 gallons, at a rate of 50 gallons per minute.  However, video and photographic evidence collected by the Baltimore Harbor Waterkeeper indicates that the actual amount of sewage that overflowed from these manholes on August 12, 2014 was significantly more than what was reported by DPW – likely in the millions of gallons.  Videos of this event can be viewed at:  https://www.youtube.com/watch?v=_-s7K_8H8qg and https://www.youtube.com/watch?v=N41G8TFS9AU .





Still frame taken from an August 12, 2014 video of a discharging sanitary sewer manhole located at 1839 Falls Road, Baltimore MD 21211.



**April 20, 2015**

On April 20 2015, rainfall caused sanitary sewer overflows along the Jones Falls Trail at approximately 2020 Falls Road, Baltimore MD 21211.  Baltimore City issued a press release regarding a sanitary sewer overflow in excess of 10,000 gallons that occurred as a result of this rain event at the Penn Station parking garage, but did not publicly address the overflows at the chronic 2020 Falls Road location.  In addition, while it is probable that OF67 discharged as a result of this rain event, no public notification was issued about OF67.

On April 21 2015, Blue Water Baltimore staff observed and documented wastewater debris at the sewer manhole structures at 2020 Falls Road and adjacent to the OF67 sewer relief pipe.  A 311 report was filed under SR# 15-00312203.  While a single traffic cone had been deployed next to a grease ball on the Jones Falls Trail, the wastewater debris had not been cleaned up nor the area cordoned off from the public.  Additionally, the site did not have any signage to alert the public to the sewage contamination.





Toilet paper, flushable wipes, and sanitary pads are caught on the guard rails and strewn throughout the grassy buffer area next to the Jones Falls Trail at 2020 Falls Road, Baltimore MD 21211 on April 21, 2015 following a rain event on April 20, 2015.





A single traffic cone is deployed next to a grease ball along the Jones Falls Trail at 2020 Falls Road, Baltimore MD 21211 on April 21, 2015 following a rain event on April 20, 2015.



**May 4, 2015**

In response to a citizen report of sewage discharging from the stormwater outfalls near 1901 Falls Road, Blue Water Baltimore staff conducted a pollution investigation and surveyed the surrounding area on May 4, 2015.  The stormwater outfalls were discharging white, milky colored water with bits of toilet paper floating in it.  A water sample was collected from this outfall for enumeration of Enterococcus bacteria; the results indicated that the discharge had a fecal bacteria contamination level of > 24,196 MPN/100mL.  Two 311 reports were filed (SR# 15-00348057; 15-00347777) by Blue Water Baltimore staff.  Both service requests were closed without being properly investigated by DPW.

The DPW later claimed during an email follow-up conversation that the service request had not been properly investigated because the Blue Water Baltimore staff member had not filed the report under the correct category (i.e. "Waterway Pollution Investigation"); however, one of these service requests was filed under "Sewer Water Outside" and the other was, indeed, filed under "Waterway Pollution Investigation".

On May 7th, Blue Water Baltimore staff conducted routine water quality monitoring in the vicinity of these outfalls and surveyed the area for wastewater debris.  The rocks leading down to the stream near OF67 were covered in debris including toilet paper, "flushable" wipes, condoms, etc.  No public notification was made about a sewage discharge at OF67.





A used condom lies on the rocks between the Jones Falls Trail and the Jones Falls stream at 2020 Falls Road, Baltimore MD 21211 on May 7, 2015.





Wastewater debris including toilet paper, tampons, and flushable wipes are strewn across the rocks between the Jones Falls Trail and the Jones Falls stream at 2020 Falls Road, Baltimore MD 21211 on May 7, 2015.



**June 23, 2015**

On June 23 2015, intense rainfall caused major sanitary sewer overflows in the Baltimore region.  Blue Water Baltimore staff surveyed the chronic SSO locations along the Jones Falls Trail at 2020 Falls Road on the morning of 6/24/15 and found that, while the manhole covers had been replaced, significant wastewater debris from the previous night remained on the roadway and trail (311 SR# 15-00493952). In addition, it appears that OF67 discharged a considerable quantity of sewage from the sewage interceptors.

Blue Water Baltimore staff observed several cyclists and runners travel through the wastewater debris on the trail. While a temporary water advisory sign was still deployed at the stormwater outfalls from an SSO several weeks prior to this date, there was no signage or cordon to prevent cyclists/runners/pedestrians from making contact with the wastewater debris on the trail.





Wastewater debris including grease balls, tampons, condoms, and flushable wipes cover the Jones Falls Trail at 2020 Falls Road, Baltimore MD 21211 on June 24, 2015.



**June 27, 2015**

On June 27, 2015, following a significant rain event, Blue Water Baltimore staff observed a high volume of a mixture of raw sewage and stormwater flowing out of several sanitary sewer manholes in the road, along the public sidewalk, and directly into the adjacent Jones Falls stream at 2020 Falls Road, Baltimore MD 21211.  The area smelled strongly of sewage and was littered with wastewater debris.  Blue Water Baltimore staff revisited the site the next day, and the area was still covered in wastewater debris and was not cordoned off from the public, despite the fact that all of the dislodged manhole covers had been replaced by that time.

Baltimore City DPW's estimate for the total volume of sewage lost as a result of these overflows was 68,000 gallons.  However, video and photographic evidence collected by Blue Water Baltimore staff indicates that the actual amount of sewage that overflowed from these manholes on June 27, 2015 was significantly more than what was reported by DPW – likely in the millions of gallons.  Video of this SSO event can be viewed at:  https://www.youtube.com/watch?v=-Zd7-59kd6c .





Three sanitary sewer manholes overflow with a mixture of raw sewage and stormwater on June 27, 2015 at 2020 Falls Road, Baltimore MD 21211.  The sewage and stormwater mixture flows directly into the Jones Falls stream, located past the guard rail seen in this picture.





Still frame taken from a June 27, 2015 video of discharging sanitary sewer manholes located at 2020 Falls Road, Baltimore MD 21211.  The discharge pressure is dislodging the sanitary sewer manhole covers.





Greaseballs and wastewater debris cover the Jones Falls Trail on June 28, 2015 from 1800-2050 Falls Road, Baltimore MD 21211.



**September 29, 2015**

On September 29, 2015 a heavy rain event caused sanitary sewer overflows along the Jones Falls Trail at 2020 Falls Road, Baltimore MD 21211.  Blue Water Baltimore staff surveyed the area on October 2, 2015 and found wastewater debris strewn along the trail, road, and in the adjacent vegetation.  Large chunks of wastewater debris, up to 5 inches in diameter, were documented near the sanitary sewer manholes in this area.  The manhole covers had been replaced, but the area was not cordoned off.  A subsequent 311 report was filed (SR# 15-00771898).





A large grease ball, approximately five inches in diameter, lays on the Jones Falls Trail at 2020 Falls Road, Baltimore MD 21211 on October 2, 2015.  This wastewater debris is a result of sanitary sewer overflows that occurred on September 29, 2015.





A used tampon lays on the Jones Falls Trail at 2020 Falls Road, Baltimore MD 21211 on October 2, 2015.  This wastewater debris is a result of sanitary sewer overflows that occurred on September 29, 2015.



**April 7, 2016**

On April 7, 2016, half an inch of rain caused sanitary sewer overflows along the Jones Falls Trail at 2020 Falls Road, Baltimore MD 21211.  Alice Volpitta went to the area to investigate on 4/7/16 at approximately 4:20 pm and the overflows were not active, but there was wastewater debris along the trail. Debris consisted of greaseballs, condoms, tampons, and an abundance of toilet paper and flushable wipes. There was evidence that OF67 discharged as well. Alice submitted a 311 report at 11:12 pm (SR# 16-00253727).

On 4/8/2016 at 8:13 am Alice's 311 report was closed.  She revisited the area at 9:30 am to see if the debris had been cleaned up. No action had been taken to clean the area; all of the wastewater debris was still along the trail and in the vegetation next to the trail, and wastewater was still pooled next to the trail. The area was not cordoned off.  Alice documented the debris and emailed Madeleine Driscoll and Dana Cooper from the Baltimore City Department of Public Works to voice her concerns about the issue.

Madeleine's response on 4/8/16 was that an investigator responded to the original service request around midnight, and did not find an active overflow.  The combination of darkness and the investigator being unfamiliar with the chronic overflow site resulted in the request being closed without further action.  In addition, Madeleine stated that the representative from their Utility Maintenance Division that routinely checks on this site after big rain was on leave.  Madeleine did not address any potential discharge from OF67, but stated that the signs posted along the trail notify trail users of the unsanitary conditions that result from overflows.  She stated that the site would be cleaned up.

On 4/12/16 Alice went back to 2020 Falls Road to survey the area.  While much of the wastewater debris had been cleared from the area, a significant amount of toilet paper and flushable wipes were still present in the vegetation and along the same stretch of the Jones Falls Trail.





Toilet paper and flushable wipes cover the ground along the stream bank next to the Jones Falls Trail at 2020 Falls Road, Baltimore MD 21211 on April 7, 2016.  This wastewater debris is a result of sanitary sewer overflows that occurred on 4/7/16.  A corresponding 311 report (SR# 16-00253727) was closed without action on 4/8/2016.





A used condom lies on the Jones Falls Trail at 2020 Falls Road, Baltimore MD 21211 on April 7, 2016. This wastewater debris is a result of sanitary sewer overflows that occurred on 4/7/16.  A corresponding 311 report (SR# 16-00253727) was closed without action on 4/8/2016.





Wastewater debris and raw sewage is ponded along the Jones Falls Trail at 2020 Falls Road, Baltimore MD 21211 on April 7, 2016.  This wastewater debris is a result of sanitary sewer overflows that occurred on 4/7/16.  A corresponding 311 report (SR# 16-00253727) was closed without action on 4/8/2016.

3545 Belair Road   •   Baltimore, MD 21213   •   410.254.1577   •   www.bluewaterbaltimore.org



## Baltimore Harbor Waterkeeper Fact Sheet
## 500 W. 29th Street - Wyman Park SSO
## June 23, 2016

- Wyman Park is an area surrounding the Stony Run stream in the Northern district of Baltimore City.  It is used extensively by Baltimore area residents for recreation including hiking, running, and fishing.  There are baseball fields and abundant grassy areas for children and adults to play in.  The Greenmount School is located adjacent to Wyman Park, and uses the Park for student recreation.

- On June 6, 2016 Blue Water Baltimore staff received a citizen report about an ongoing dry-weather Sanitary Sewer Overflow in Wyman Park, street address 500 W. 29th Street, Baltimore MD 21211 (GPS 39.321137, -76.625921).  This SSO was located less than 20 feet from the corner of a parking lot on 29th Street.  Blue Water Baltimore staff surveyed the location at 12:00 PM and found sewage flowing up out of the ground and out of a broken pipe.  The area was covered in toilet paper and there was visible fecal matter in the water flowing from the ground.  A strong stench of sewage emanated from the area.

- Blue Water Baltimore staff made a report via the 311 App for this SSO (SR# 16-00404800).  This report was closed out less than 30 minutes after it was submitted, without action.  Blue Water Baltimore staff were still on location at this time, and called 311 to see why the Service Request was closed.  The operator indicated that the DPW crew assigned to this SSO thought the address correlated to the Burger King across the street, so he did not investigate any further.

- Blue Water Baltimore staff re-opened the 311 request with the operator under SR# 16-00406027.  This request was also closed out without being addressed.  When Blue Water Baltimore staff called to inquire about the status of the request, the operator indicated that the DPW crew couldn't locate the overflow.

- Blue Water Baltimore staff re-opened the 311 request under SR# 16-00406578, and field crews again could not locate the SSO, despite being given explicit directions about how to get there.

- On June 7, 2016 a representative from Baltimore City DPW indicated that the agency would not perform any repairs to the broken pipe because it was a "privately owned asset" belonging to the Greenmount School.  It was later revealed via email that this property is owned by Baltimore City, and the responsibility of any repairs lies with the City.

- Despite discovering the SSO on the evening of June 6th, Baltimore City DPW failed to cordon off the area, remove any of the wastewater debris in the surrounding area, or deploy temporary health warning signage.  This condition persisted until at least 11:57 am on June 9th, 2016. Baltimore City DPW never issued a public notification about the SSO.

- Video of this SSO can be viewed at:  https://www.youtube.com/watch?v=8jt6mus0wfE and https://www.youtube.com/watch?v=THIyWPcjd5k .





The Sanitary Sewer Overflow discovered on June 6, 2016 in Wyman Park was located less than 20 feet from the corner of an easily-accessible parking lot at 500 W 29th Street, Baltimore MD 21211.





June 6, 2016.  Raw sewage flows from a broken sewer line in the grassy area next to the parking lot at 500 W. 29th Street.  Toilet paper and other wastewater debris litter the area nearby.

3545 Belair Road   •   Baltimore, MD 21213   •   410.254.1577   •   www.bluewaterbaltimore.org





June 6, 2016.  Toilet paper, food, and other wastewater debris coat the grass in the area of the SSO at 500 W. 29th Street.





June 6, 2016.  Raw fecal matter and toilet paper flow out of the broken sewer pipe in Wyman Park.





June 6, 2016.  The broken pipe at 500 W. 29th Street was actively discharging raw sewage into the grassy area next to a parking lot just downhill from several baseball fields in Wyman Park.





June 9, 2016.  Sewage continues to flow from the Sanitary Sewer Overflow in Wyman Park at 500 W. 29th
Street.  The area has not been cordoned off and no temporary health signs have been deployed.
Sewage is pooling at the site and the area stinks of sewage.

Exhibit F



July 11, 2016

*Via Electronic Mail Only*

Lynn Buhl, Director, Water Management Administration
Maryland Department of Environment
Lynn.Buhl@maryland.gov

Jon Capacasa, Director, Water Protection Division
U.S. EPA Region III
Capacasa.Jon@epa.gov

Ms. Buhl and Mr. Capacasa,

I am sending this email on behalf of Blue Water Baltimore with regards to a continuous sanitary sewer overflow (SSO) to Baltimore's Chinquapin Run stream, which has been ongoing since at least March 30 of this year and is continuous to present-date.

The purpose of this letter is two-fold: (1) to provide EPA and MDE with a report about the SSO and to share our concerns about the City Department of Public Work's (DPW) response to-date; and (2) to request information and action by the EPA and MDE to ensure that the City DPW is required to mitigate and resolve this SSO in a timely manner that is protective of water-quality and public safety.

<u>Background and Timeline</u>

The SSO is located on the Chinquapin Run, which is a tributary to the Herring Run. To our knowledge, the SSO is related to a sewer line break in a partially-submerged sewer crossing. City DPW first provided public notification about the leak 23 days after the agency first detected the sewer leak. At that time, City DPW first asserted that any water-contact should be avoided as a result of the SSO. Subsequent public statements by DPW staff assert that the SSO has been fixed and that bypass pumping has not been deployed to mitigate the continuous, ongoing sewage discharge.

Photos and a link to a video of the Chinquapin SSO are provided below my signature.

*March 30, 2016* - City DPW discovers the SSO in the Chinquapin Run, estimated flow is 0.25 gallons per minute.



*April 10, 2016* - Baltimore City Department of Recreation and Parks hosts a "Fishing Fun" day at the Hall Springs area of Herring Run Park, which is a fishing derby geared towards children aged 15 and under.  The Hall Springs area of Herring Run Park is downstream of the sewage leak in the Chinquapin Run.

*April 22, 2016* - DPW issues a press release to provide its first public notification of the Chinquapin Run SSO and cites the 10,000-gallon reporting "threshold" referenced in COMAR 26.08.10.08(C). This section of the State's SSO public notification regulations is clearly superseded by COMAR 26.08.10.08(A), which would have required earlier notification to the public.
(http://www.dsd.state.md.us/comar/comarhtml/26/26.08.10.08.htm)

The City's press release providing the SSO public notification can be found at the following link. "DPW Plans Repair of Leaking Sewer Main," April 22, 2016.
(http://publicworks.baltimorecity.gov/news/press-releases/2016-04-22-dpw-plans-repair-leaking-sewer-main)

*April 25, 2016* - A DPW spokesperson indicates that the agency would not deploy sewage bypass pumping at this location, because "bypassing this at this location would be very costly".  See "Chinquapin Run sewage leak went 23 days before city reported it," Baltimore Brew, April 25, 2016. (https://www.baltimorebrew.com/2016/04/25/chinquapin-run-sewage-leak-went-23-days-before-city-reported-it/)

*May 10, 2016* - Blue Water Baltimore staff document the ongoing SSO in the Chinquapin Run. Our staff do not observe any effort to repair the leak or mitigate the sewage discharge at this time.

*May 26, 2016* - DPW asserts that it has cleaned and re-lined the damaged sewer line.

*June 6, 2016* - Blue Water Baltimore staff document the ongoing SSO in the Chinquapin Run. The sewage flow discharge does not appear to have been mitigated by the DPW's work on May 26.

*June 6, 2016* - A DPW spokesperson indicates to a media outlet that the Chinquapin Run SSO was stopped on May 26th. (http://foxbaltimore.com/news/local/public-meeting-scheduled-to-discuss-ongoing-sewage-problems)

*June 9, 2016* - Blue Water Baltimore staff document the ongoing SSO in the Chinquapin Run and alert the DPW to the ongoing nature of this SSO.

2



*June 9, 2016* - DPW statements to the press continue to assert that the SSO has been fixed:

"
*Asked why a leak known since March 30 was not fixed until May 26, DPW's Raymond said there were difficult circumstances.*

*"Due to the location of the leak near a stream and not near any roads, it was a difficult repair to plan and execute," he said. "We also had to contend with wet weather which prevented us from getting heavy trucks and equipment to the location."*
"

"Sewage still leaking into Chinquapin Run, Blue Water says", Baltimore Brew, June 9, 2016. (https://baltimorebrew.com/2016/06/09/sewage-still-leaking-into-chinquapin-run-blue-water-says/)

*June 10, 2016* - DPW staff indicate via email that the agency is working with MDE on a solution to the ongoing SSO, and that they cannot provide further details about the plan to control and abate the SSO.

*June 28, 2016* - Blue Water Baltimore staff document the ongoing SSO in the Chinquapin Run and request more information from the DPW.  DPW staff again indicate that they are working on a solution to the ongoing SSO with MDE and that they cannot provide further details about the plan or timing to eliminate the SSO.

<u>Concerns</u>

This series of events has raised a number of concerns:

1. We are concerned about the substantial delay between the City DPW's first reported detection of the SSO on March 30 and the City's first public notification on April 22. The delay in public notification contravenes State law (COMAR 26.08.10.08(A)) and is not in accordance with the requirements of both the State's public notification regulations and the current and proposed modified Consent Decree. *See* 2002 Consent Decree at VI.16.B.i. "Emergency Response Plan – Unpermitted Discharges."[1]

---

[1] "The Emergency Response Plan shall include but not be limited to: [i.] A detailed description of the actions Baltimore will undertake to immediately provide notice to the public (through the local news media and other means) of the unpermitted discharge of pollutants from the wastewater treatment and Collection System to surface waters, including a plan for notifying the public that such discharge has caused an adverse



The continuous sewage discharge has very likely increased the risk of illness for limited water-contact recreation downstream. The flow-rate of the SSO discharge has posed, at all times prior to public notification on April 22, a significant risk to public health. Indeed, the City agency has since stated that water-contact should be avoided. Unfortunately, the eventual public disclosure of the SSO by DPW was made almost two weeks following a water-contact event on the Herring Run, which was sponsored and coordinated by another City agency without knowledge of the ongoing SSO. As a result of the delay in public notification by DPW, members of the public were undoubtedly exposed to raw sewage without their knowledge through formal and informal water-contact recreation occurring on the Chinquapin and Herring Run streams.

2. We are concerned that the City DPW has made public statements indicating that work to eliminate the SSO has been completed, but in actuality the SSO continues unabated. Between the April 22nd public notification and present-date, the City has not provided any updated public notification to indicate the ongoing hazard resulting from the uncontrolled sewage discharge. As a result, members of the public may be unaware of the continuing risk of contact and are relying upon the City's prior public statements that indicate that work to arrest the SSO has been completed.

3. We are concerned that City DPW staff have indicated, in communications to Blue Water Baltimore, that a plan to repair the SSO is being negotiated with MDE. DPW staff have not provided any details about the timing of the proposed plan to eliminate the SSO. As a result, the SSO continues unabated for the foreseeable future and the public is not informed about the status of the SSO response or plans to mitigate or eliminate the SSO.

4. To this end, we are also concerned that the City has not taken any interim measures to control or mitigate the continuous sewage discharge. DPW staff have made public statements to indicate that bypass pumping would not be deployed to mitigate this SSO because of the cost of the mitigation measures. Our observations from the field corroborate that the City has not utilized bypass pumping or other measures to

---

impact on water quality measured by turbidity, dissolved oxygen, fecal coliform, total coliform, or other bacteriological standards required by State law related to the discharge of domestic wastewater. For purposes of Paragraphs 16 and 17, the phrase "adverse impact" shall mean any decrease in the levels of dissolved oxygen and any increase in the levels of the above-listed pollutants in the water body over background – i.e., the levels in the water body of such pollutants prior to, and immediately upstream of, the discharge."



mitigate the SSO. Based upon the volume and water-quality impact of the continuous discharge, we think that the adverse impact and public health threat posed by the SSO justifies bypass pumping until the leak can be repaired.

5. We are concerned that the City's SSO flow estimate of 0.25 gal./min. is a significant underestimate of the actual flow-rate. We think that the estimate is significantly inaccurate based upon our numerous observations of the submerged discharge over the past three months. We have observed on several occasions the continuous discharge of wastewater debris from the SSO.

6. Finally, we are concerned that the City's temporary signage to alert the public to the SSO has not been sufficiently maintained since it was first deployed in late April. For example, signage at the location of the SSO was no longer present by June 28th (See photos below). Additionally, temporary signage that indicates that the SSO is ongoing should be deployed at locations downstream where levels of fecal bacteria exceed State standards for the waterways' designated uses.

*Questions & Requests for EPA/MDE Action*

1. What are EPA and MDE's plans for stopping this sewage discharge?  When is the City going to eliminate the SSO?

2. What is the nature of the negotiations between the City and MDE on this matter? Has the EPA been included in these discussions about this SSO? If not, why?

3. Has the City proposed to resolve the ongoing SSO through a pipe relocation project that was already planned prior to discovery of the SSO, or will the City be required to abate the SSO before the planned pipe relocation project?

4. Between now and the time a permanent fix is made, bypass pumping is an appropriate measure to mitigate the discharge.  Until the permanent fix occurs, will EPA and MDE require the City to use bypass pumping?  If not, why not?

5. What actions, if any, will the EPA and MDE take to address our concerns about the City's deficient public notification for this SSO?

6. We would also appreciate it if EPA and MDE could respond to all the concerns expressed above.



Thank you for your attention and assistance.

Sincerely,

David Flores
Baltimore Harbor Waterkeeper
Blue Water Baltimore
3545 Belair Road
Baltimore, Maryland 21213
DFlores@bluewaterbaltimore.org | 410-254-1577 X112

*CC Via Electronic Mail Only*

Graham.Allison@epa.gov
Price-Fay.Michelle@epa.gov
Rivera.Nina@epa.gov
Nancy.Young@maryland.gov
Madeleine.Driscoll@baltimorecity.gov
Dana.Cooper@baltimorecity.gov
HVandergaag@bluewaterbaltimore.org

6



_Photographs and Videos of the Chinquapin Run SSO_



_Chinquapin Run SSO, May 10, 2016. Temporary signage pictured at location of SSO._





*Chinquapin Run SSO, June 9, 2016. Temporary signage pictured in tree branches above SSO.*





*Chinquapin Run SSO, June 28, 2016. Temporary signage no longer present at location of SSO.*

*https://youtu.be/ep-7NbdtbfM Video of Chinquapin Run SSO, June 6, 2016.*

*https://youtu.be/n5LCSIUVSX4 Video of Chinquapin Run SSO, June 9, 2016.*